FILED
United States Court of Appeals
Tenth Circuit

November 14, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

ANN ELWELL; GREG ELWELL,

      Plaintiffs−Appellees,

v.

BOB BYERS; LYNNEA KAUFMAN,

      Defendants−Appellants.

Nos. 11-3172 & 11-3174

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:08-CV-2227-EFM)**

Carl W. Ossman (Brian Dempsey and David W. Davies, with him on the briefs), State of Kansas - SRS Legal Division, Topeka, Kansas, for the Defendants-Appellants.

Charles T. Schimmel (W. Greg Wright with him on the briefs), Beam-Ward Kruse Wilson Wright & Fletes LLC, Overland Park, Kansas, for the Plaintiffs-Appellees.

Before **LUCERO**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

**LUCERO**, Circuit Judge.

This case grows out of an avoidable tragedy. Ann and Greg Elwell were in the process of adopting T.S., a young boy who had been in their care almost his entire life.

But approximately one month after a complaint of emotional abuse of another child in the Elwells' care—which all parties agree did not raise concerns for T.S.'s safety or welfare and was subsequently deemed unsubstantiated—state officials withdrew the license allowing the Elwells to care for T.S. and removed him from their home without any advance notice. Despite a state court's finding that the agency acted wrongfully in removing the boy, he was never returned to them.

The Elwells brought suit against several state officials involved in the removal under 42 U.S.C. § 1983. On a motion for summary judgment, the district court concluded that qualified immunity did not shield the state officials from liability. We agree with the district court that the defendants violated the Elwells' Due Process rights when they removed T.S. without notice. However, despite our sympathy for the Elwells' plight, we must conclude that this violation was not clearly established in our case law at the time of T.S.'s removal. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's denial of summary judgment.

**I**

We recite the facts of the case in the light most favorable to the plaintiffs. See Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010). Ann and Greg Elwell, a married couple with two biological children, held a license issued by the Kansas Department of Health and Environment ("KDHE") that allowed them to keep two foster

children in their home.[1]  They became foster parents of T.S. in March 2006, when the child was three months old.  Very soon thereafter, the parental rights of T.S.'s biological parents were terminated.  The Elwells bonded with the child over the next year and took substantial steps towards adopting him.  They were identified as T.S.'s "adoptive resource" and, with the support of the state department of Social and Rehabilitative Services ("SRS"), a state court approved of the proposed adoption plan and set the final adoption hearing for May 4, 2007.

On April 4, 2007, SRS received a report that Mrs. Elwell had emotionally abused another foster child in her care.  The report alleged that Mrs. Elwell kept the child in soiled clothes for a short period after the child wet herself.  Although SRS initially decided the allegations had substance, the agency agreed to designate the report as unsubstantiated after the events at issue in this case transpired.

SRS, KDHE, county health officials, and the Elwells agreed to remove the allegedly abused child from the Elwell home.  Initially, agency staff did not express concern that T.S. might have to be removed as well.  However, KDHE eventually concluded that it would terminate the Elwells' foster care license.  As the investigation into the complaint progressed, SRS made plans to place T.S. with another family.  No one notified the Elwells of the possibility of T.S.'s removal.  In fact, defendant Lynnea

---

[1] Technically speaking, the Elwells had an exception to their day care license that allowed them to provide foster home care to two children.  However, in the interests of brevity and clarity, we refer to the Elwells' foster care exception as a foster care license.

Kaufman, an SRS supervisor, directed other agency employees to keep this information from the Elwells until the investigation was complete.

Sometime in early May, SRS decided it would deem the report of emotional abuse as substantiated. On May 11, agency staff held a meeting and determined that T.S. would be removed from the Elwells' home and placed with a different family on the following Monday. On that day, May 14, KDHE withdrew the Elwells' foster care license, effective immediately. SRS officials arrived at the Elwell home and told Mrs. Elwell they were removing T.S. This was the first the Elwells heard of SRS's plan. In Mrs. Elwell's words, the family was "devastated."

Despite the revocation of their KDHE license, T.S. could have remained in the Elwells' care if an adoption placement agreement had been completed. KDHE indicated that it would have been willing to delay withdrawing the license to allow this step to be taken. Defendants Kaufman and Bob Byers, however, determined that SRS would not sign an adoption consent form, and thus elected not to offer an adoption placement packet.

The Elwells alleged that SRS violated a Kansas statute that required thirty-day notice to foster parents before a foster child who had been in their care for at least six months could be removed. See Kan. Stat. Ann. 38-2558 (2007).[2] They sought a hearing in state court to challenge T.S.'s removal. The state court found that "[t]here were no concerns for [T.S.'s] safety and protection in the Elwell home" and that SRS "could have and should have notified the Elwells of the intent to remove" him. Unfortunately,

_____

[2] The statute has since been amended. See 2008 Kan. Sess. Laws, ch. 169, § 13.

-4-

litigation over T.S.'s placement dragged on, and the court did not consider the possibility of returning T.S. to the Elwells until March 2008. By then, T.S. had been living with another family for almost a year, and the court concluded that T.S. had significantly bonded with that family and that removing him from his new home would be more disruptive than beneficial. Although the court sympathized with the Elwells' "unrectifiable loss," it concluded that removing T.S. a second time was not the proper remedy for the harm they had suffered.

The Elwells subsequently filed this action pursuant to 42 U.S.C. § 1983 in federal district court against Kaufman and Byers, asserting violations of procedural and substantive due process rights. The defendants asserted qualified immunity with respect to both claims. On a motion for summary judgment, the district court granted qualified immunity on the substantive due process claim, but denied it as to the procedural due process claim. Kaufman and Byers now appeal the denial of qualified immunity.

**II**

**A**

We have jurisdiction to review the denial of summary judgment on qualified immunity grounds when such denial presents "abstract issues of law." Shrum v. City of Coweta, 449 F.3d 1132, 1137 (10th Cir. 2006). We review the district court's determination as to qualified immunity de novo. Amundsen v. Jones, 533 F.3d 1192, 1198 (10th Cir. 2008). To overcome a defense of qualified immunity, a plaintiff must show: (1) that the official's actions violated a constitutional right and (2) that the right was clearly established at the time of the action. Id. Courts retain discretion to consider

-5-

those questions in the order they see fit.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).[3]

It is "often beneficial," however, to address the constitutional merits first, in order to

"promote[] the development of constitutional precedent."  <u>Id.</u>  That rationale suits this

case well.

The concurrence would not have us address the constitutional question.  We

conclude that the question is appropriately considered for two reasons.  First, the district

court's legal ruling was that a protected liberty interest exists, and that is the issue before

us on appeal.  We can affirm a lower court's ruling on any grounds adequately supported

by the record, even grounds not relied upon by the district court.  <u>See</u> <u>Dummar v.</u>

<u>Lummis</u>, 543 F.3d 614, 618 (10th Cir. 2008).  The statutory basis of the district court's

conclusion does not foreclose our review of the constitutional question.

Second, as we discuss <u>infra</u>, both the Supreme Court in <u>Smith v. Organization of</u>

<u>Foster Families for Equality & Reform</u>, 431 U.S. 816 (1977) (hereinafter "<u>OFFER</u>"), and

we in <u>Spielman v. Hildebrand</u>, 873 F.2d 1377 (10th Cir. 1989), dodged the constitutional

issue presented in this case.  As the Court recently reaffirmed, addressing the

constitutional issue is often "advantageous" under such circumstances.  <u>Camreta v.</u>

_____

[3] Qualified immunity only extends to "government officials performing discretionary functions."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Because the discretionary-function question is quite obvious in many cases, it is frequently omitted from the qualified immunity analysis.  <u>See, e.g.</u>, <u>Pearson</u>, 555 U.S. at 231-32.  It is quite apparent that Kaufman and Byers were engaging in official, discretionary functions when they decided to remove T.S. without prior notice.  Perhaps for this reason, the discretionary-function element was not a matter of dispute below.  Accordingly, we find meritless the Elwells' argument that Byers and Kaufman waived their entitlement to qualified immunity by not mentioning this point in their opening brief.

Greene, 131 S. Ct. 2020, 2031 (2011). "[O]ur regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." Id. As the Camreta court explained:

> Consider a plausible but unsettled constitutional claim asserted against a government official in a suit for money damages. The court does not resolve the claim because the official has immunity. He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established. Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive. Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. Qualified immunity thus may frustrate the development of constitutional precedent and the promotion of law-abiding behavior.

Id. (footnote, quotation, and citations omitted).

We are faced with such a dilemma. By passing over the constitutional issue on multiple occasions, courts have failed to clarify the law with the result that these tragedies continue to occur without legal recourse to the victims. Accordingly, we proceed to the constitutional question.

**B**

The first step in assessing a claimed procedural due process violation is to identify a constitutionally protected liberty or property interest. A liberty interest can either "inhere in the Due Process clause or it may be created by state law." Boutwell v. Keating, 399 F.3d 1203, 1212 (10th Cir. 2005) (quotation and ellipses omitted). The

-7-

district court held the Elwells' liberty interest was created by Kan. Stat. Ann. § 38-2258 (2007). We disagree with the district court's conclusion regarding state law.[4]

**1**

For state law to create a liberty interest, it must establish substantive predicates to govern official decisionmaking and mandate an outcome when relevant criteria have been met. Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 462-63 (1989), abrogated on other grounds, Sandin v. Conner, 515 U.S. 472, 483-84 & n.5 (1995); see also PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1200 (10th Cir. 2010) (applying Thompson framework in child welfare case). "If the decisionmaker is not required to base its decisions on objective and defined criteria, but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all, the State has not created a constitutionally protected liberty interest." Olim v. Wakinekona, 461 U.S. 238, 249 (1983) (quotations omitted), abrogated on other grounds, Sandin, 515 U.S. at 483-84 & n.5. In other words, "process is not an end in itself"; when state law creates a mandatory procedure but does not guarantee a particular substantive outcome, it does not confer a protected liberty interest. Id. at 250; see also Doyle v. Okla. Bar Ass'n, 998 F.2d 1559, 1570 (10th Cir. 1993) ("The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process clause.").

At the time of the events at issue, Kansas state law provided:

Change of placement; removal from home of parent, findings by court.

---

[4] We have been admonished that "a court of appeals should review de novo a district court's determination of state law." Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).

(a) . . . [I]f a child has been in the same foster home or shelter facility for six months or longer, or has been placed by the secretary in the home of a parent or relative, the secretary shall give written notice of any plan to move the child to a different placement unless the move is to the selected preadoptive family for the purpose of facilitating adoption.  The notice shall be given to: . . . (3) the foster parent or custodian from whose home or shelter facility it is proposed to remove the child . . . .

(b)  The notice shall state the placement to which the secretary plans to transfer the child and the reason for the proposed action.  The notice shall be mailed by first class mail 30 days in advance of the planned transfer . . . .

(c)  Within 10 days after receipt of the notice, any person receiving notice as provided above may request, either orally or in writing, that the court conduct a hearing to determine whether or not the change in placement is in the best interests of the child concerned.  When the request has been received, the court shall schedule a hearing and immediately notify the secretary of the request and the time and date the matter will be heard. . . . The secretary shall not change the placement of the child, except for the purpose of adoption, unless the change is approved by the court.

Kan. Stat. Ann. § 38-2258 (2007).

The Elwells argue that the statute guarantees, absent certain exceptions, that a foster child will not be removed without prior notice.  But the guarantees of the statute are plainly procedural rather than substantive.  "There is no articulable distinction between the object of [the Elwells] asserted entitlement and the process [they] desire[] in order to protect [their] entitlement."  Town of Castle Rock v. Gonzales, 545 U.S. 748, 772 (2005) (Souter, J., concurring).  The statute does not prohibit the ultimate removal of a child if certain requirements are satisfied; it simply mandates procedures that must be followed prior to removal.  Subsections (a) and (b) require only notice, which this court has described as the "core of procedure."  See Elliott v. Martinez, 675 F.3d 1241, 1245

-9-

(10th Cir. 2012); see also Rodriguez v. McLoughlin, 214 F.3d 328, 340 (2d Cir. 2000) (holding that statute requiring notice to foster parents does not create a liberty interest).

Subsection (c) presents a slightly closer question. That provision allows for a hearing upon request, which is clearly procedural. But it also states that SRS "shall not change the placement of the child, except for the purpose of adoption, unless the change is approved by the court." Kan. Stat. Ann. § 38-2258(c) (2007). This provision requires that a child not be removed from a foster home, except by court order, once a hearing has been requested. But this provision does not mandate any particular outcome of the procedures at issue; rather, it simply sets the rules as to a child's placement pending that outcome. And because the statute does not direct that "a particular outcome must follow," it cannot give rise to a constitutionally protected liberty interest. Thompson, 490 U.S. at 462.

**2**

Having rejected the Elwells' statutory argument, we consider whether they possessed a liberty interest that is inherent in the Due Process Clause. There can be no doubt that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-640 (1974). As the Court declared in Meyer v. Nebraska, 262 U.S. 390 (1923), the liberty guaranteed by the Due Process Clause "denotes not merely freedom from bodily restraint but also the right of the individual . . . to marry, establish a home and bring up children, . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit

of happiness by free men." Id. at 399. "[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (citation omitted).

Although these venerable cases concern families with some biological connection, the Supreme Court has made clear that "biological relationships are not exclusive determination of the existence of a family." OFFER, 431 U.S. at 843. Although a biological relationship bears some import, the Court stressed that "the importance of the familial relationship, to the individuals involved and to the society," rests in part on "the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." Id. at 844 (quotation and alteration omitted). "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." Id.

The OFFER Court acknowledged that foster families and biological families differ in at least one important respect: Unlike biological families, "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." Id. at 845. Nonetheless, the Court indicated that the liberty interest in family association may extend to foster parents in certain circumstances:

-11-

At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.

Id. at 844.

In Spielman v. Hildebrand, 873 F.2d 1377 (10th Cir. 1989), we applied OFFER to a case involving preadoptive parents. We noted that the status of preadoptive parents "differs significantly" from that of typical foster-care parents, who care for children on a temporary basis because the object of the preadoptive placement was to locate a "permanent, stable home." Id. at 1384. Although they "have not yet attained the status of adoptive parents, who like natural parents, have a protected liberty interest in their familial relationships with their children," preadoptive parents have a more "significant relationship than foster care because of the possibility of developing a permanent adoptive relationship." Id. at 1384. On this basis, we distinguished several sibling-circuit cases holding that typical foster families lack a protected liberty interest in maintaining the foster home. Id.

Following OFFER, we acknowledged that because "the claimed interest [of preadoptive parents] derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties." Id. (quoting OFFER, 431 U.S. at 845). Looking to the specific facts of the Spielman case, we held that "[t]he preadoption agreement, coupled with the SRS representations at the time the children were placed with the [preadoptive parents], may

-12-

have given the [preadoptive parents] a reasonable expectation of developing a permanent relationship with the child that rises to a liberty interest meriting limited due process protection." Id. at 1385. Rather than holding outright that such an interest existed, however, we concluded any due process rights of the Spielmans had been honored because they were afforded a hearing before the child was removed. Id.

We cannot follow the same path in this dispute because the Elwells were not afforded even the most elemental process—notice—before T.S. was removed. Nevertheless, we conclude that Spielman's analysis is persuasive in spite of its tentative determination and hold that the Elwells had a liberty interest in their relationship with T.S. Several facts specific to the Elwells' circumstances counsel in favor of this conclusion. First, as in Spielman, the parental rights of T.S.'s biological parents had been terminated. See id. at 1384; see also OFFER, 431 U.S. at 846 (distinguishing a hypothetical case in which a foster parent's potential liberty interest would conflict with that of a biological parent). Second, the Elwells had cared for T.S. for an extended period of time; they were essentially the only parents T.S. had ever known when the events at issue occurred. See id. at 844 (noting that foster parents "should hold the same place in the emotional life of the foster child" if the "child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents"). Third, and also like the Spielmans, the Elwells were very close to becoming adoptive parents, although some steps remained in that process. See Spielman, 873 F.2d at 1379.

-13-

In addition, nothing in either state law or the contractual arrangements at issue would have tempered the Elwells' "reasonable expectation of developing a permanent relationship" with T.S. Id. To the contrary, under Kan. Stat. Ann. § 38-2258 (2007), the Elwells were statutorily guaranteed thirty days' notice prior to removal of T.S. from their home. Similarly, a state court order approving the Elwells' adoption plan stated that T.S. was not to be removed from the Elwells care, absent an emergency, without written consent of the court. And the Elwells' Foster Care Placement Agreement explicitly required thirty days written notice prior to removal.

We recognize that the typical foster care arrangement generally does not create a liberty interest in familial association. See Spielman, 873 F.2d at 1384 (citing cases). But the Elwells, who had cared for T.S. nearly his entire life and were on the verge of adopting him, fall closer to the status of adoptive parents than in the ordinary, temporary foster arrangement. Thus, we do not need to define precisely where the liberty interest threshold falls on this spectrum, but conclude that the Elwells fall on the protected side of that line under the facts of this case.

**3**

Our conclusion that the Elwells possessed a liberty interest does not end our due process inquiry; the Elwells must also demonstrate that they were deprived of their interest without sufficient process. Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006). It is clear that the parental rights of biological parents may not be terminated without "fundamentally fair procedures." Santosky v. Kramer, 455 U.S. 745, 754 (1982). And, even outside the familial association context, "some kind of hearing is

-14-

generally required before a person is deprived of a protected interest." Spielman, 873 F.2d at 1385.

State actors may forgo pre-deprivation process only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Id. We have recognized that "'[v]alid governmental interests' include emergency circumstances which pose an immediate threat to the safety of a child." Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1245 (10th Cir. 2003). Such threats to the safety of children clearly implicate an important governmental interest that must be taken seriously in this context. Further, because preadoptive parents' liberty interest is not as strong as that of biological parents, a lesser threat to safety might justify postponing the process due to preadoptive parents. See Santosky, 455 U.S. at 754 (the "process due" depends on "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure").

But the defendants have not shown that there was any concern for T.S.'s welfare. To the contrary, both Kaufman and Byers candidly admitted that there were no immediate safety concerns about leaving T.S. in the Elwells' home. Agency staff members similarly testified that there was no emergency as to T.S.'s safety or welfare when he was removed. Moreover, the state court found that "no emergency existed requiring immediate action to move [T.S.]."

The Elwells claim entitlement to the bare minimum of process—notice. We have no difficulty concluding that the Elwells' interest entitled them to this "elementary and

fundamental requirement." Schroeder v. City of New York, 371 U.S. 208, 211 (1962).

Accordingly, we affirm the district court's conclusion that the Elwells' constitutional

rights were violated when T.S. was removed from their home without any advanced

notice.[5]

## C

Because the Elwells' constitutional rights were violated, we must consider

whether those rights were clearly established. "Ordinarily, in order for the law to be

clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or

the clearly established weight of authority from other courts must have found the law to

be as the plaintiff maintains." Poolaw v. Marcantel, 565 F.3d 721, 733 (10th Cir. 2009)

(quotation omitted).

Spielman is the only Tenth Circuit decision on point, and given its assumed-but-

not-decided conclusion as to whether preadoptive parents possess a liberty interest, 873

F.2d at 1385, it surely cannot have rendered a violation clearly established. The effect of

that decision was just the opposite: Spielman left the law unclear. The Elwells claim that

---

[5] The statute upon which the Elwells rely required notice thirty days prior to removal. See Kan. Stat. Ann. § 38-2258 (2007). Our holding is not dependent on that statute, and thus it does not follow that the Constitution requires notice that far in advance. See Santosky, 455 U.S. at 755 ("The minimum requirements of procedural due process being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." (quotation and alteration omitted)). But in light of the fact that the Elwells did not receive any advance notice, we need not decide precisely how far in advance preadoptive parents must be apprised of the impending removal, or define the bounds of any other procedural protections. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (notice must be delivered at "a reasonable time"). We simply hold that the defendants violated the Elwells' rights by failing to provide them any advance notice whatsoever.

a single case decided by the Eastern District of Pennsylvania clearly established that certain foster parents possess a liberty interest in maintaining their family structure. See McLaughlin v. Pernsley, 693 F.Supp. 318, 326-27 (E.D. Pa. 1988). Although the precise quantum of case law sufficient to clearly establish a violation is a matter of some dispute, we think it quite evident that a single case from an out-of-circuit district court cannot clearly establish the law in the Tenth Circuit. Moreover, McLaughlin's holding was grounded in state law, making it inapplicable in light of our conclusion that Kansas law did not give rise to the Elwells' protected interest.

The district court concluded that the Kansas statute itself clearly established the constitutional violation. But as explained in § II.B.1, supra, we conclude that the statute did not create a constitutionally cognizable liberty interest, let alone clearly establish one. Although Kan. Stat. Ann. § 38-2258 (2007) might have apprised the defendants that their conduct was contrary to state law, it could not have established that removal of T.S. without notice was unconstitutional for qualified immunity purposes. See, e.g., Buck v. City of Albuquerque, 549 F.3d 1269, 1290 (10th Cir. 2008) (stating that the clearly established inquiry turns on whether defendants had "fair warning that their conduct violated the plaintiff's constitutional rights" (emphasis added)). A violation of state law does not necessarily violate the constitution. And on the constitutional question, no court had answered whether preadoptive parents in the Elwells' position possessed a liberty interest in familial association.

The Elwells suffered a devastating violation of their Fourteenth Amendment rights, and we are not insensitive to their plight.  But given the state of the case law, we must reverse the district court's qualified immunity determination.

## III

We **REVERSE** the district court's denial of summary judgment on qualified immunity grounds and **REMAND** with instructions that summary judgment be entered.

**11-3172, 11-3174,** *Elwell. v. Byers*
**MATHESON, J., concurring**

I concur in the result and join the majority opinion except for Sections II.B.2,

II.B.3, and II.C. I do not join these sections because the district court's denial of

qualified immunity to Defendants Kaufman and Byers rested exclusively on its

conclusion that the Elwells had a clearly established liberty interest under Kan. Stat. Ann.

§ 28-2258. Our reversal on this point makes it unnecessary to discuss whether the

Elwells had a liberty interest in their relationship with T.S. arising under the Due Process

Clause.

The district court recognized that a liberty interest could arise under (1) federal

law, i.e., the Due Process Clause itself, or (2) state law, i.e., Kan. Stat. Ann. § 28-2258.

On the first basis, the court concluded that such a liberty interest was not clearly

established under Supreme Court or Tenth Circuit precedent. It observed that the

Supreme Court has "never decided the question definitively" and that "there is no clear

answer in the Tenth Circuit." *Elwell v. Byers*, No. 08-2227-EFM, 2011 WL 1980277, at

*2 (D. Kan. May 20, 2011). In other words, if the Due Process Clause itself were the

Elwells' only basis for a liberty interest, the district court would have *granted* the

Defendants qualified immunity based on a lack of clearly established law.[1]

The district court then turned to whether Kan. Stat. Ann. § 28-2258 could give rise

to a liberty interest. In its words, this was "the only liberty interest that could have been

---

[1] The court later opined, "as a matter of first impression," that the Due Process
Clause does give rise to a liberty interest. *Elwell v. Byers*, No. 08-2227-EFM, 2011 WL
1980277, at *4 (D. Kan. May 20, 2011). But this determination was unnecessary because
the court had already stated the law was not clearly established on this point.

clearly established." *Elwell*, 2011 WL 1980277, at \*2. The court held that the statute gave rise to a clearly established liberty interest and that the Defendants were not entitled to qualified immunity because they violated the statute when they removed T.S. from the Elwells' home without notice.

I agree with the majority opinion's holding in Section II.B.1 that the Kansas statute does not give rise to a liberty interest. This holding reverses the sole basis for the district court's qualified immunity ruling and thus grants the Defendants the relief they seek on appeal. We should not go on to discuss the Due Process Clause issue because it was not the basis of the district court's denial of qualified immunity.[2]

---

[2] This court has recognized that it "may affirm on alternative grounds . . . when those grounds are dispositive, indisputable, and appear clearly in the record." *United States v. Schneider*, 594 F.3d 1219, 1227 (10th Cir. 2010). The majority opinion's discussion of the Due Process Clause issue does not qualify as an affirmance on alternative grounds because this court is reversing the district court's qualified immunity decision.