v.

The PEOPLE of the State of
Colorado, Respondents

In the Interest of Minor Child: A.C.,

and

A.C., by and through his
Guardian ad Litem.

No. 11SC725

Supreme Court of Colorado.

June 10, 2013

Certiorari to the Colorado Court of Appeals, Court of Appeals Case No. 10CA2536

Pickard & Associates, P.C., Joe Pickard, Kerry Simpson, Justin Ross, Littleton, Colorado, Attorneys for Petitioners.

Douglas J. Friednash, Denver City Attorney, Laura Grzetic Eibsen, Assistant City Attorney, Denver, Colorado, Attorneys for the Respondent the People of the State of Colorado.

Robert G. Tweedell, Delta, Colorado, Guardian ad Litem for the Minor Child.

Linda Weinerman, Sheri M. Danz, Dorothy M. Macias, Denver, Colorado, Attorneys for Amicus Curiae the Office of the Child's Representative.

Morrison & Foerster, Randall J. Fons, John R. Lanham, Rocky Mountain Children's Law Center, Stephanie Villafuerte, Jeffrey C. Koy, Denver, Colorado, Attorneys for Amicus Curiae the Rocky Mountain Children's Law Center.

Justice BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this dependency and neglect case, we review the court of appeals' opinion in *People ex rel A.C.,* —— P.3d ——, No. 10CA2536 (Colo.App. Sept. 15, 2011) (selected for official publication), which held that removal of a child from his preadoptive foster parents' home without prior notice to the foster parents did not violate their due process rights. We agree.

¶ 2 The foster parents in this case, though identified by the juvenile court as prospective adoptive parents, had not yet initiated the adoption process. Because of this, we conclude that the foster parents' legal rights with regard to A.C. are indistinguishable from a typical foster care placement. We hold that the preadoptive foster parents in this case do not possess a constitutionally protected liberty interest. Because we conclude that they do not possess a liberty interest, we need not consider whether a due process violation occurred. Hence, we affirm the court of appeals and return this case to that court to be remanded to the trial court for further proceedings consistent with the court of appeals' opinion.

## I. Facts and Proceedings Below

¶ 3 A.C. was born with cocaine in his system. As a result, the Denver Department of Human Services ("the Department") placed A.C. in foster care immediately upon his discharge from the hospital, when he was only two days old. Before his first birthday, the juvenile court terminated the parent-child legal relationship between A.C. and both of his biological parents, which made him available for adoption.[1] Because A.C.'s first two foster placements were unable to provide a safe, permanent home, the Department ultimately placed him with M.S. and S.S., the foster parent appellants in this case. Initially, the foster parents were identified as a temporary placement, but after A.C. had been in the home for several weeks, they expressed an interest in adopting him.

---

1. Several months after A.C.'s birth, his biological mother stopped communicating with the Department, and her location was unknown. The identity of A.C.'s biological father was never discovered. The juvenile court terminated both parent-child legal relationships.

¶ 4 Over the next several months, the Department reported that A.C. was making positive progress and that the foster parents were meeting his needs. After A.C. resided with the foster parents for approximately seven months, the juvenile court affirmed the permanency plan of adoption by a non-relative and identified the foster parents as the prospective adoptive parents.[2] Shortly thereafter, however, the child's in-home therapist presented the Department with a report that detailed various statements and behaviors of the foster mother that, if true, would give rise to concerns about the foster mother's mental health. Upon receipt of this report, the Department removed A.C. from the foster parents' home without notifying the foster parents, the court, or the child's guardian ad litem beforehand.[3]

¶ 5 The foster parents alerted the guardian ad litem that the Department had removed A.C. from the home, and the guardian ad litem filed a motion for a forthwith hearing that requested, among other things, an evidentiary hearing to determine the necessity and appropriateness of A.C.'s removal from the foster parents' home.[4] Because of the concerns raised by the therapist about the foster mother's mental health, the court ordered a psychological evaluation to be conducted on an expedited basis to determine whether the child could be returned safely to the foster parents' home. After the examination was completed, the psychologist informally summarized her findings to the court, and the court set the matter for a contested hearing.[5]

¶ 6 At the contested hearing, which the court converted from a hearing on A.C.'s removal to a placement hearing, the psychologist opined that she had significant concerns about the child's well-being because of the foster mother's mental health diagnosis. The psychologist testified that the foster mother experienced problems with reality testing; that she frequently made outlandish or incredible statements; and that she suffered from distortions in her thinking. After hearing extensive evidence about the foster mother's mental health issues, the court ultimately determined that it was not in A.C.'s best interests to return him to the foster parents' home for purposes of adoption.

¶ 7 On appeal, the court of appeals held that the foster parents did not have a constitutionally protected liberty interest in their relationship with A.C. and, as a result, did not consider whether a due process violation occurred. The court of appeals also determined that the juvenile court misapplied the best interests standard, and it remanded the case with instructions for further proceedings.[6] We granted certiorari to determine whether preadoptive foster parents possess a constitutionally protected liberty interest in their relationship with a foster child.[7]

2. In dependency and neglect proceedings, a permanency plan is a court order that gives direction to the parties regarding what is in the child's best interests. See generally§ 19–3–702, C.R.S. (2012) (permanency planning statute). Although the permanency plan in this case was adoption by a non-relative, that does not commence the adoption process. A separate adoption case must be filed.

3. A guardian ad litem is an attorney appointed to represent the best interests of the child. See §§ 19–1–111 and 19–3–203, C.R.S. (2012); see also People v. Gabriesheski, 262 P.3d 653, 659 (Colo.2011).

4. Specifically, the GAL requested a hearing "to determine the necessity and appropriateness of the Department's removal of the minor child from the home of the prospective adoptive parents, ... to determine the necessity of any continued removal or detention of the minor child from the home of the prospective adoptive parents, and to determine whether an Order of non-removal needs to be entered pursuant to Section 19–3–702(5)(b), C.R.S., to insure the well-being and best interests of the minor child."

5. Despite the foster parents' repeated requests for notice and an evidentiary hearing regarding A.C.'s removal, the court's attention shifted from the child's removal to his long-term placement for adoption, and a hearing on the necessity and appropriateness of A.C.'s removal never occurred.

6. The best interests of the child standard as discussed by the court of appeals is not encompassed by the granted certiorari question, and we do not address it here.

7. Specifically, we granted certiorari to consider whether preadoptive foster parents of a child whose biological parents' rights have been terminated have a constitutionally protected liberty interest in a continued relationship with the child and a right to due process concerning removal of the child from the parents' home.

## II. Analysis

¶ 8 The foster parents argue that as prospective adoptive parents, they had a reasonable expectation that their relationship with A.C. would continue, and that they therefore possess a constitutionally protected liberty interest in their relationship with the child. The foster parents further contend that A.C.'s removal from their home without prior notice or a pre-removal hearing violated their procedural due process rights.

¶ 9 The Fifth and Fourteenth Amendments of the United States Constitution guarantee that the government shall not deprive any person of an interest in "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This clause imposes two different constraints on governmental decisions: procedural due process and substantive due process. *Whiteside v. Smith*, 67 P.3d 1240, 1256–57 (Colo.2003) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Procedural due process involves what kind of notice and what form of hearing the government must provide when it takes a certain action. Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 557 (4th ed. 2011).

¶ 10 "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If there is no denial of a liberty or property interest, then the government does not have to provide procedural due process. Hence, to allege a procedural due process violation, an individual first must establish that he or she possesses a protected interest.

¶ 11 Relevant to this case, liberty interests include freedom of personal choice in matters of family life. See *Watso v. Colo. Dept. of Social Serv.*, 841 P.2d 299, 306 (Colo. 1992). A liberty interest can be created either by state law or by the Due Process Clause of the United States Constitution. *Sandin v. Conner*, 515 U.S. 472, 479, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), *overruled on other grounds by Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).

### A. State Law

¶ 12 Initially, we examine whether Colorado law creates a protected liberty interest for preadoptive foster parents. State law, in certain circumstances, may give rise to a liberty interest that implicates the procedural protections of the Due Process Clause. *Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). "For state law to create a liberty interest, it must establish substantive predicates to govern official decisionmaking and mandate an outcome when relevant criteria have been met." *Elwell v. Byers*, 699 F.3d 1208, 1214 (10th Cir.2012). The expectation to receive certain process does not itself create a protected liberty interest. *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1570 (10th Cir.1993). Thus, when a state statutory scheme "creates a mandatory procedure but does not guarantee a particular substantive outcome, it does not confer a protected liberty interest." *Elwell*, 699 F.3d at 1214.

¶ 13 In the dependency and neglect context, for example, a provision that requires notice and a hearing prior to a child's removal from a home only establishes mandatory procedures. Such a provision does not dictate a particular outcome of that hearing once the procedures have been followed and therefore would not create a constitutionally protected interest. *Id.* at 1215. In order for a statute to create a liberty interest for preadoptive foster parents, then, it must substantively limit the exercise of discretion with respect to the removal of a child. *Rodriguez v. McLoughlin*, 214 F.3d 328, 340 (2d Cir. 2000).

¶ 14 In this case, because no adoption proceeding had commenced, the foster parents' claim of a liberty interest must be based within the dependency and neglect statutes.[8] The statutes dictate the procedures relating to foster parents in the judicial system. They provide that the Department

---

8. If the foster parents had initiated an adoption proceeding, then their claim of a liberty interest arguably could have been analyzed under the statutory framework for adoptions. See § 19–5–200.2, et seq., C.R.S. (2012).

shall notify foster parents of any administrative review of a foster child's case. § 19–3–507(5)(b), C.R.S. (2012). With regard to all hearings, foster parents possess not only the right to notice but also the right to be heard. § 19–3–502(7), C.R.S. (2012). The statutes also authorize intervention by foster parents who have cared for a child for more than three months and who claim to have information or knowledge concerning the care and protection of the child. § 19–3–507(5)(a), C.R.S. (2012). Foster parents who meet the required statutory criteria to intervene under this subsection may participate fully in a termination hearing without limitation. *A.M. v. A.C.*, 2013 CO 16, ¶40, 296 P.3d 1026. The statutes further provide that when a child resides with foster parents, a trial court *may* consider whether·the foster parents are capable and willing to provide a stable and permanent environment, but the court is not required to do so. § 19–3–702(5)(b), C.R.S. (2012).

¶ 15 These provisions in our dependency and neglect statutes "are plainly procedural rather than substantive" because they do not guarantee a particular outcome. *Elwell*, 699 F.3d at 1214–15. No provisions in the dependency and neglect statutes prohibit the removal of a child from a foster placement. Instead, the court must consider and act on the child's best interests. Because the dependency and neglect statutes that pertain to foster parents do not mandate a particular substantive outcome, we conclude that Colorado state law does not create a constitutionally protected liberty interest for preadoptive foster parents under the circumstances of this case.

### B. United States Constitution

 ¶ 16 Having decided that the foster parents do not have a constitutionally pro-

tected interest under the Colorado statutory scheme, we turn to the Due Process Clause of the United States Constitution. Freedom of personal choice in matters of family life is a protected liberty interest entitled to due process protections. *Elwell*, 699 F.3d at 1215. This liberty interest encompasses the rights of natural and adoptive parents. The United States Supreme Court has not recognized such a liberty interest for preadoptive foster parents. See *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 846, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). Only a few other courts, none of them binding on this court, have held that preadoptive foster parents possess a liberty interest under certain circumstances.[9]

¶ 17 The foster parents primarily rely on *Thelen v. Catholic Social Serv.*, 691 F.Supp. 1179, 1184–85 (E.D.Wis.1988), to argue that they possess a liberty interest in their relationship with A.C.[10] In *Thelen*, after extensive interviews, home visits, submissions for physical examinations, and payments of fees, prospective adoptive parents entered into a contractual Adoptive Parents' Agreement with a child-placing agency licensed by the Wisconsin Department of Health and Human Services. *Id.* at 1180. The agency placed a child with the prospective adoptive parents, but several months later, it terminated the placement. *Id.* In determining whether the prospective adoptive parents possessed a liberty interest, the *Thelen* court noted that the parents had taken every feasible step toward adoption, including filing an application with the child placement agency, undergoing "exhaustive evaluation," qualifying for the placement of a child in their home, and having the child placed in their home.[11] *Id.* at 1184. The court held that these facts created a

---

9. The Colorado Supreme Court is bound only by decisions of the United States Supreme Court and is not bound by decisions of lower federal courts. *Community Hosp. v. Fail*, 969 P.2d 667, 672 (Colo.1998); *see also Hill v. Thomas*, 973 P.2d 1246, 1255 (Colo.1999).

10. The foster parents also rely in part on *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir.1982), to advance this argument. Rivera, however, concerned a custodial half-sister who had cared for her half-siblings for years prior to the formal

foster relationship. *Id.* at 1017. This case, on the other hand, does not involve the rights of custodial relatives, and the foster parents' reliance on *Rivera* is misplaced.

11. Under Wisconsin law, prospective adoptive parents may not file an adoption petition until the child has been in the home for more than six months. Thus, even though the parents in *Thelen* had not filed a petition for adoption, they had taken all steps toward adoption that were avail-

reasonable expectation that the child "eventually [would] be theirs forever," and it concluded that the foster parents therefore possessed a limited liberty interest. *Id.*

¶ 18 Similarly, the Tenth Circuit Court of Appeals recently held that preadoptive foster parents, under a particular set of circumstances, have a protected liberty interest in their relationship with a foster child. *Elwell,* 699 F.3d at 1217. In *Elwell,* a couple in Kansas was "on the verge" of adopting a young boy after he had resided with them for over a year. *Id.* at 1211. The state already had approved the proposed adoption plan and the court had scheduled the final adoption hearing when state officials appeared at the foster parents' home without prior notice and removed the child. *Id.* at 1211–12. The *Elwell* court found that these facts, coupled with the foster parents' "reasonable expectation of developing a permanent relationship with the child," gave rise to a liberty interest. *Id.* at 1217.

¶ 19 Both *Thelen* and *Elwell* involve prospective adoptive parents who had initiated the adoption process in accordance with the laws of their respective states. The commencement of the adoption process, along with the particular facts and circumstances of each case, gave rise to a reasonable expectation that the foster parents' relationship with the child would become permanent.

¶ 20 In contrast, the foster parents in this case, though identified as prospective adoptive parents in the permanency plan, had not initiated the adoption process. The foster parents did not take any necessary procedural steps toward adopting A.C., such as entering into the preadoption agreement that must precede an adoption petition in Colorado. *See* Colo. Code Regs. § 2509-8 (2012) (stating that under Regulation No. 7.710.59(F), "[a] written contract between the placement agency and the adoptive applicant(s) shall be executed at the time of placement" and must include an agreement that the adoptive applicant(s) will file an adoption petition). No adoptive home study was conducted, no adoption hearing was scheduled, and the foster parents did not petition the court to adopt the child. They had not entered into any contractual adoption agreement. The foster parents in this case therefore did not have a reasonable expectation that their relationship with A.C. would become permanent.

¶ 21 Thus, we conclude that the foster parents' legal rights with regard to A.C. are indistinguishable from a typical foster care placement. Although we recognize that the Department improperly handled the removal of the child, we hold that the preadoptive foster parents in this case do not possess a liberty interest grounded in the United States Constitution.

## C. Due Process Violation

¶ 22 We next turn to the foster parents' contention that A.C.'s removal from their home violated their procedural due process rights. As previously explained, in order to establish a violation of due process, one must first establish a constitutionally protected liberty interest that warrants due process protections. *SeeBd. of Regents v.Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Because we conclude that the preadoptive foster parents in this case do not have a constitutionally protected liberty interest, we need not consider whether a due process violation occurred.

## III. Conclusion

¶ 23 For the reasons stated, we affirm the court of appeals and return this case to that court to be remanded to the trial court for further proceedings consistent with the court of appeals' opinion.

¶ 24 JUSTICE EID concurs in the judgment, and JUSTICE MÁRQUEZ joins in the concurrence in the judgment.

JUSTICE EID, concurring in the judgment.

¶ 25 In this case, the foster parents argue that their due process rights were violated when the Department removed the minor child, A.C., from their care. As a brief review of the procedural facts shows, there is no juvenile court ruling to review in this case.

able to them at the time. *Thelen,* 691 F.Supp. at 1184.

Indeed, the only ruling issued by the juvenile court that could form the basis of an appeal—namely, the ruling that the foster parents' motion for due process was moot—was not appealed. I therefore would dismiss this case as moot.

¶ 26 In response to the GAL's request for a forthwith hearing, a hearing was held on September 14th. At this hearing, the Department acknowledged that it had violated section 19-3-203(2), C.R.S. (2012), when it failed to notify the GAL that it was planning to remove A.C. from the foster parents' care. The Department then stated that it had removed the child from the foster parents' home because it had concerns about the foster mother's mental health. Counsel for the foster parents, who were permitted to intervene in the proceedings, agreed that such concerns, if true, would be troubling, and requested that a hearing be held as soon as possible so that the concerns could be addressed and the child returned to the foster home. After considering the court's and counsels' schedules (including the schedule of foster parents' counsel), the court set a hearing the following week. The court also ordered that the Department supply the foster parents with any additional information upon which it would rely at the next hearing. Counsel did not object to this process.

¶ 27 At the September 21st hearing, the Department again stated that it had serious concerns about the foster mother's mental health, and asked that the court order that a psychological examination be performed. It also informed the court that it had contacted a psychologist who could conduct an examination on an expedited basis, perhaps in less than a week. The GAL agreed that a decision regarding whether the child should be returned to the foster parents should be put off until the results of the mental health examination were known. Counsel for the foster parents argued that the Department had not shown that the child was in danger, and that he should therefore be returned to their care. The court ultimately determined that it would be better to wait a week for the examination report, rather than to order that the child be returned and then to remove the child again if the report justified removal.

Counsel for the foster parents again did not object to this procedure, and in fact stated that "I'm pleased we were able to get back in here [today] and that we got another hearing [within a week]."

¶ 28 At the September 27th hearing, the psychologist stated her preliminary conclusion that the foster mother had a serious mental health disorder, and that the child should not be returned to her care. The Department stated that, based on psychologist's testimony, the child should not be returned at this time to the foster parents' care, and asked that the case be set for a full contested evidentiary hearing for a permanent placement. The GAL joined the Department's request for a contested evidentiary hearing. The court 1) concluded that it would not be appropriate to return the child to the foster parents' care at this time; 2) ordered that a full contested evidentiary hearing be held; and 3) ordered that the foster parents be permitted to continue to visit the child on a regular basis. Counsel for the foster parents again asked that the child be returned to their care, but did not object to the court's decision to set the case for a contested hearing, rather than a removal hearing.

¶ 29 The contested hearing was initially set for October 21st, but was continued to November 15th because the foster parents failed to disclose to the Department their rebuttal psychologist expert and his report.

¶ 30 On November 1st, the foster parents filed their "Request for Due Process." In that motion, the foster parents asked that the court "order [the Department] to reduce to a writing the allegations against Intervenors [the foster parents] warranting the removal of the child from their care and that such be provided at least 10 days prior to the November 15, 2010 hearing." At the November 15th hearing, the court indicated that it would begin by addressing the foster parents' motion. The Department argued that it had supplied the foster parents with all documentation and witness information pertaining to the basis for removing the child from the foster parents care—that is, the foster mother's mental health. The court stated that, given the disclosure, the motion

was moot. Counsel for the foster parents agreed that the motion "just commemorates the argument that we've been presenting from the beginning and that is that we ought to know why we're here." Counsel continued that, while he needed more information in the past, "I'm not going to stand here and say I need more information from the Department [now].... In that sense ... the motion is moot." The court did not consider the motion further, and the hearing proceeded. Ultimately, the court determined that it was not in the best interest of the child to be returned to the foster parents' home.

¶ 31 Before the court of appeals, the foster parents argued that their due process rights were violated when A.C. was removed from their care. Nowhere, however, did the foster parents argue that the juvenile court erred in any of its rulings in this regard.[1] They did not argue, for example, that the juvenile court erred when it found their request for written allegations to be moot–presumably because, as noted above, their counsel agreed with the court that by the time they made the motion, they had received all of the information upon which the Department would rely at the hearing. Instead, they essentially asked for a declaration that the Department did not comport with the dictates of due process when it removed the child.

¶ 32 The court of appeals declined to sort through the procedural posture of this case, and instead ruled that whatever procedural protections that might have been lacking during the removal process were not required because the foster parents had no "constitutionally protected liberty interest in a continued relationship with A.C." *People ex rel A.C.*, —— P.3d at ——, No. 10CA2536, slip. op. at 5. But simply because the court of appeals took this course does not mean that we should.

¶ 33 At bottom, the foster parents ask us to declare that their due process rights were violated. I see no grounds for us to make such an advisory ruling. I therefore would dismiss this case as moot, and respectfully concur only in the result reached by the majority.

¶ 34 I am authorized to state that JUSTICE MÁRQUEZ joins in the concurrence in the judgment.

---

1. By contrast, in a second issue, the foster parents challenged the juvenile court's conclusion that it was not in the best interest of the child to be returned to the foster parents' care. The court of appeals determined that the juvenile court may have applied an incorrect best interest of the child standard, and remanded the case for further consideration. We denied certiorari on this second issue, and therefore it is not relevant here.