FILED
**United States Court of Appeals
Tenth Circuit**

**April 5, 2024**

**Christopher M. Wolpert
Clerk of Court**

PUBLISH

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

No. 22-4096

KEVIN ALONSO ZAMORA,

Defendant – Appellant.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:21-CR-00526-JNP-1)**

_____

Bretta Pirie, Assistant Federal Public Defender (Scott Keith Wilson, Federal Public Defender, with her on the briefs), Salt Lake City, Utah for Defendant-Appellant.

Briggs J. Matheson, Assistant United States Attorney (Trina A. Higgins, United States Attorney, and Elizabethanne C. Stevens, Assistant United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **KELLY**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Appellant Kevin Alonso Zamora challenges the procedural reasonableness of his sentence. He contends the district court erroneously applied a two-level sentencing enhancement for reckless endangerment during flight under § 3C1.2 of the United States Sentencing Guidelines. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I[1]

### A

In mid-December 2021, at approximately 1:00 a.m., local law enforcement in Taylorsville, Utah, discovered a car reported stolen the day before. The unoccupied car was parked outside an apartment building. As five people approached the vehicle, officers moved in, some in their squad cars and others on foot. All the suspects except Mr. Zamora got inside the stolen vehicle and drove off, backing into a police car in the process. Mr. Zamora fled on foot.

With law enforcement in pursuit, Mr. Zamora ran through the empty streets of a residential neighborhood. He then crossed an intersection into a commercial area, heading toward a Taco Bell. Mr. Zamora cut across the

---

[1] The facts recited here derive from the appellate record, including the district court filings, body camera footage, the sentencing hearing transcripts, and the undisputed description of Mr. Zamora's offense conduct in the Presentence Investigation Report.

Taco Bell's drive-thru lane. The restaurant was still open, and an occupied car sat in the drive-thru next to the menu board. Mr. Zamora cut in front of the car and collapsed face first on the sidewalk next to the drive-thru. Officers approached Mr. Zamora and ordered him to show his hands. Mr. Zamora appeared to comply. He remained on the sidewalk and was arrested.

An officer at the scene searched Mr. Zamora, lifting him up in the process to rest against the base of a streetlight. Mr. Zamora was bleeding from somewhere on his lower body. One officer stated he heard a "pop" as Mr. Zamora ran around the Taco Bell, and another officer asked Mr. Zamora "did you shoot yourself?" Body Camera Footage at 02:50-03:10. The officer conducting the search emptied Mr. Zamora's front pockets but did not find a gun. He then cut Mr. Zamora's right pant leg and saw a gun tucked inside Mr. Zamora's pants—between the waistband and his underwear. The officer removed the gun and unloaded the magazine onto the sidewalk.

Mr. Zamora received medical assistance at the scene. An ambulance transported him to a local hospital, and he underwent surgery. As it turned out, the gun found on Mr. Zamora had fired, and the bullet shot through his groin area, fracturing his tibia.

**B**

**1**

On December 22, 2021, a federal grand jury returned a one-count indictment charging Mr. Zamora with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The indictment specified, on December 11, Mr. Zamora unlawfully possessed a Glock 19 handgun. Mr. Zamora was convicted after pleading guilty pursuant to a plea agreement.

The United States Probation Office prepared a Presentence Investigation Report (PSR) with a recommended Guidelines calculation. Mr. Zamora was assigned a base offense level of 20, under U.S.S.G. § 2K2.1(a)(4)(A). The PSR included a two-level enhancement under § 2K2.1(b)(4) because Mr. Zamora possessed a stolen gun. As relevant here, the PSR then added another two-level enhancement under § 3C1.2 because Mr. Zamora "recklessly created a substantial risk of death or serious bodily injury to another person during his flight from a law enforcement officer." App. III at 52, ¶ 19. To account for Mr. Zamora's acceptance of responsibility, the PSR calculated a three-level reduction under § 3E1.1. The resulting total offense level was 21. The PSR assigned Mr. Zamora a criminal history score of 17, placing him in category VI. Probation

4

determined Mr. Zamora's advisory Guidelines range was 77 to 96 months' imprisonment.

Mr. Zamora filed a written objection to the § 3C1.2 enhancement. He emphasized the streets were deserted when he fled from police, and he was the only one injured when the gun went off. Mr. Zamora contended, under these circumstances, his armed flight did not recklessly create a substantial risk, as the Guideline requires. In its sentencing memorandum, the government urged the district court to apply the § 3C1.2 enhancement. "Running from officers with a firearm that is capable [of] discharging grossly deviates from the standard of care that a reasonable person would exercise," the government explained. App. I at 22. The addendum to the PSR echoed the government's position, stating "[t]he probation office believes the defendant engaged in reckless behavior that created substantial risk to another person given the unintentional discharge of the firearm." App. III at 33.

At the sentencing hearing, Mr. Zamora asserted this case involved only armed flight and "simply running [from law enforcement] with a gun in your pants" was not a sufficient factual basis for applying the reckless-endangerment enhancement. App. II at 38. The government responded that Mr. Zamora "was not fleeing law enforcement with just a gun in his pocket." App. II at 40. "The gun was cocked. It was ready to fire." App. II at 40–41.

"The only way this gun went off," the government said, "is because the defendant reached in his pocket to pull the gun out." App. II at 41. The prosecutor based this assertion on her "conversation[s] with . . . law enforcement officers[] who are very experienced with firearms." App. II at 41.

The district court began with the undisputed facts. Mr. Zamora was "evading law enforcement with a loaded weapon," the district court found, and "the weapon went off." App. II at 36. The district court then asked defense counsel "was the gun in such a position that just running caused it to fire or did your client actually reach for the weapon which caused it to fire?" App. II at 36. "[E]ither [Mr. Zamora] reached for it," the district court reasoned, "or it was being carried in such a manner that it created the risk of going off." App. II at 37–38. Mr. Zamora said "we have no idea how this [gun] actually fired" and maintained "as an evidentiary matter" it was inappropriate for the district court to "fill in the gaps to conclude how this gun went off." App. II at 37. According to the district court, "when you're being pursued by law enforcement, if you have a gun that is in a position to go off, particularly if you're reaching for the weapon, that is a serious risk to law enforcement." App. II at 36.

The district court asked if the government was going "to bring in testimony" to support its assertion that Mr. Zamora's finger was on the

trigger. App. II at 42–43. The prosecutor said no testimony was needed. App. II at 43. The district court disagreed, reasoning that if the government wished "to make a proffer about [Mr. Zamora's] gun being cocked and the enhancement, then [it] need[ed] testimony here." App. II at 52. Mr. Zamora's sentencing hearing was continued for approximately a month. App. II at 54–55.

## 2

At the second sentencing hearing, the government called Special Agent Kent Owens of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[2] Agent Owens was familiar with a Glock's "specific trigger safety mechanisms" and explained the Glock has "three safety mechanisms that have to come into play for the firearm to fire." App. II at 68–69. Agent Owens testified that even according to Glock's "own website . . . the trigger has to be deliberately pressed for [the gun] to fire." App. II at 69.

The district court asked Agent Owens if a set of keys in the same pant pocket as a Glock could inadvertently "push the trigger and the safety

---

[2] Earlier, the government filed notice that Agent Owens would "testify about discharge of [Mr. Zamora's] firearm." App. I at 42.

mechanism simultaneously," causing the weapon to discharge.[3] App. II at 70. Agent Owens did not believe that could happen. App. II at 71. Rather, the trigger would need "between five and seven pounds of pressure . . . to be activated," he testified, and would "have to move between a quarter inch to a half inch for it to engage the safety mechanism." App. II at 71. When asked by the district court if "there would have to be ammunition in the gun" for it to fire, Agent Owens replied "yes." App. II at 71. The district court then queried whether "there need[ed] to be something done to the ammunition to get a bullet into the chamber." App. II at 71. A Glock requires a magazine containing ammunition to first be loaded into the bottom of the gun, Agent Owens said, and then "you would rack the slide and that would put a round into the chamber." App. II at 71–72. On cross-examination, Agent Owens agreed it was "possible" a Glock could fire "if you had the trigger stationary and the gun went forward[.]" App. II at 77.

In rebuttal, defense counsel called David Bahde, a former police officer and tactical consultant. App. II at 80–81.[4] Mr. Bahde testified a

---

[3] As the government correctly notes, "There is no evidence that Zamora had any keys in his pocket and the firearm was loose in his pants and not in his pocket." Aplee. Br. at 15 n.3.

[4] Mr. Zamora filed notice that Mr. Bahde would testify as "a firearms expert, to rebut evidence offered by the Government about the firearm in this case." App. I at 62.

Glock "does not know the difference between a finger or anything else," so the gun could go off if something other than a finger put enough pressure on the trigger. App. II at 81. The "most common example" is clothing getting caught between the trigger guard and the holster. App. II at 82. He explained, what "will often happen is if [the clothing] gets stuck in the holster and you go to push the holster down and the clothing is preventing the trigger from moving and you're pushing down . . . that will actually cause a discharge." App. II at 82. Mr. Bahde testified he had not seen a Glock fire "when it was just loose in somebody's jeans pocket," but a Glock could fire in that manner, he believed, if it caught on a belt or other clothing with enough force to exert five to seven pounds of pressure on the trigger. App. II at 83. He also testified it was "not particularly safe" to carry a Glock unholstered in a pocket while running and "possibly" could create a danger to other people but was "more likely" a "danger to yourself." App. II at 87.

At the close of the testimony, the parties reprised their arguments, focusing on whether Mr. Zamora's conduct during his armed flight warranted application of the enhancement. Though it was not "advisable to run with a gun in your pants," Mr. Zamora maintained, "we have a very plausible explanation of how this gun could have gone off without any reaching, any touching whatsoever." App. II at 90–91. The government took a different view of the evidence, claiming Mr. Zamora "was reaching for the

9

gun and caused the gun to fire." App. II at 88. The prosecutor explained Mr. Zamora's case presented armed flight "plus him touching the trigger which is what made the gun go off." App. II at 92–93.

The district court overruled Mr. Zamora's objection and applied the two-level enhancement under § 3C1.2. The district court acknowledged there "has to be something more than just flight" and "more than armed flight" to justify § 3C1.2. App. II at 121. The district court did not accept the government's theory that Mr. Zamora was reaching for the gun, with his finger on the trigger, when it fired. Based on the testimony, "it [was] possible for that gun to fire if it [was] not properly holstered and if there [was] a round in the chamber," the district court reasoned, "and if there [was] a lot of physical activity and exertion going on that could cause the gun to be forced down against an object." App. II at 121–22.

Still, the district court determined Mr. Zamora engaged in conduct that supported the enhancement: "what we have is armed flight with a fully loaded Glock, with a round in the chamber, not being carried in a holster, where it discharged." App. II at 121. The district court admitted "we don't know exactly what happened." App. II at 122. But Mr. Zamora's gun fired, "which would be either the result of the fact that it was not stored in a safe way or that [Mr. Zamora] reached for the gun." App. II at 122. The district court further explained,

> [E]ither way, the absence of a holster plus the cocked gun with a round in the chamber and running from law enforcement, where the gun discharged . . . does show reckless behavior, and the fact that [Mr. Zamora] was shot, and I think could have easily, depending on where law enforcement was, if they were trying to pat him down to figure out if there was a weapon, there could have been many ways that gun could have misfired and created a serious risk of bodily injury to law enforcement . . . .

App. II at 122.

The district court then adopted the advisory Guidelines range recommended in the PSR—77 to 96 months' imprisonment. After granting a downward variance, the district court sentenced Mr. Zamora to 60 months in prison, followed by three years of supervised release. This timely appeal followed.

## II

The only issue on appeal is whether the district court erroneously applied the two-level enhancement under § 3C1.2. The government always has to prove the applicability of a sentencing enhancement by a preponderance of the evidence. *United States* v. *Conley*, 131 F.3d 1387, 1389 (10th Cir. 1997). "A challenge to the application of a sentencing enhancement tests the 'procedural reasonableness' of a sentence, 'which requires, among other things, a properly calculated Guidelines range.'" *United States* v. *Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (quoting *United States* v. *Cook*, 550 F.3d 1292, 1295 (10th Cir. 2008)). "When evaluating the

district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *Id.* (quoting *United States* v. *Munoz-Tello*, 531 F.3d 1174, 1181 (10th Cir. 2008)). "We review for clear error both the district court's determination that [defendants'] . . . flight constituted reckless endangerment [under § 3C1.2], and its determination that [defendants] were responsible for that recklessness." *Conley*, 131 F.3d at 1389.

Mr. Zamora urges reversal, contending "[t]he district court's factual findings do not permit its conclusion that the way [he] carried the gun constituted reckless endangerment." Aplt. Br. at 15. He insists the district court clearly erred in finding his armed flight was reckless and that he created a substantial risk of death or bodily injury to another person.[5]

---

[5] Mr. Zamora and the government agree the standard of review is clear error. Aplt. Br. at 15; Aplee. Br. at 27. But "to the extent the defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant an enhancement, we must conduct a de novo review." *United States* v. *Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009) (quoting *United States* v. *Scott,* 529 F.3d 1290, 1300 (10th Cir. 2008)); *see also United States* v. *Young*, 893 F.3d 777, 779 (10th Cir. 2018) (applying *de novo* review because "[i]n his briefing and at oral argument, Mr. Young stressed that he is not challenging any of the district court's factual findings; instead, he accepts the findings of fact and argues solely that the facts are insufficient as a matter of law to warrant the enhancement"). Mr. Zamora has not asked us to engage in *de novo* review and, in any event, our disposition in this appeal does not turn on the standard of review.

We first describe the applicable law and then consider each of Mr. Zamora's challenges. As we explain, we discern no error in the district court's conclusion that Mr. Zamora engaged in conduct during flight rising to the level of reckless endangerment under the § 3C1.2 enhancement.

**A**

Section 3C1.2 of the United States Sentencing Guidelines states "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase [the defendant's offense level] by 2 levels." U.S.S.G. § 3C1.2. The word "recklessly" in § 3C1.2 is defined by reference to the definition of recklessness in § 2A1.4, which sets the base offense level for involuntary manslaughter. *Id.* § 3C1.2 cmt. n.2. For purposes of § 3C1.2, recklessness means "the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id.* § 2A1.4 cmt. n.1. By its terms, § 3C1.2 "applies only when a defendant actually creates a substantial risk." *Young*, 893 F.3d at 780.

In *United States* v. *Conley*, a key precedent in our circuit concerning § 3C1.2, we acknowledged "[n]ot every flight from a crime scene . . . will constitute reckless endangerment under § 3C1.2. There are situations in

13

which a defendant might flee from law enforcement officers in a manner that does not recklessly endanger others." 131 F.3d at 1390. In *Conley*, the defendants robbed a credit union at gun point and fled in a getaway vehicle. *Id.* at 1388. The ensuing chase "reach[ed] speeds of up to 100 m.p.h., along a road that was both icy and damp." *Id.* at 1389. The defendants ran through two roadblocks and, at one point, "drove toward [an] officer's car, forcing him to move out of the way to avoid collision." *Id.* We affirmed the application of the § 3C1.2 enhancement, focusing on "the facts of this flight" and agreeing with the district court that the defendant's "actions involve[d] a known risk of danger to others, and constituted a gross deviation from the standard of care that a reasonable person would have exercised in that same situation." *Id.* at 1389–90. In so holding, we emphasized "[m]ere reasonable foreseeability of the reckless behavior at issue is not enough by itself to support a § 3C1.2 enhancement." *Id.* at 1390.

There is no dispute Mr. Zamora was fleeing from law enforcement, that he was armed during flight, and that his gun actually went off. In the district court, the government did not attempt to base the enhancement solely on these facts but focused on proving additional conduct by Mr. Zamora during his armed flight to support reckless endangerment.[6] The district court,

---

[6] The government agreed at oral argument that the application of § 3C1.2 requires "armed flight plus more" and took the same position before

14

Probation, and Mr. Zamora likewise understood that mere possession of a firearm during flight will not automatically warrant the application of § 3C1.2. This is a readily discernable premise from the text of the Guideline and cases interpreting it. Unlike some of our sister circuits, we have never explicitly held that mere possession of a firearm during flight is insufficient to support application of § 3C1.2. We do so now.

*United States* v. *Brown* is instructive. 314 F.3d 1216, 1221 (10th Cir. 2003). *Brown* involved the application of the § 3C1.2 enhancement where an armed suspect, while fleeing law enforcement, disposed of a gun near a school bus stop. *Id.* at 1220. The district court found the defendant's conduct made the gun "accessible to children that are in grade school," which clearly placed the children in danger. *Id.* at 1221. On appeal, we rejected the defendant's argument that his conduct constituted "mere flight" that did not justify the enhancement. *Id.* In affirming the district court's finding that the defendant recklessly created a risk, we focused on the defendant's disposal of the weapon near a school bus stop, which, we reasoned, "undoubtedly created a substantial risk of death or serious bodily injury to those children and to the other

---

the district court. Oral Arg. at 15:00-08, 18:47-59, 21:07-14; App. II at 40, 92–93. This is unsurprising. The government's litigation strategy concerning the application of § 3C1.2 did not rest on a showing that Mr. Zamora possessed a firearm while running from law enforcement—which he inarguably did—but on proving, through expert testimony, he recklessly created a risk by having his finger on the trigger of a loaded gun during the flight.

bystanders" and "was certainly a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id. Brown* proceeded from the premise that the defendant possessed a firearm during flight, but there was no indication the § 3C1.2 enhancement could have applied simply because the defendant was armed. The analysis in *Brown* thus focused on the additional conduct engaged in by the armed defendant during flight to discern if he recklessly endangered others. *See id.*[7]

In *United States* v. *Shivers*, the Fourth Circuit persuasively held what we have long assumed—that the facts must show "'something more' than mere instinctive armed flight" to support § 3C1.2. 56 F.4th 320, 323 (4th Cir. 2022) (quoting *United States* v. *Dennings*, 922 F.3d 232, 237 (4th Cir. 2019)). In *Shivers*, an armed suspect fled from police on foot, and during the flight, threw a revolver in the street. *Id.* at 323. The district court applied the § 3C1.2 enhancement, reasoning the defendant had to reach for the

---

[7] Our unpublished decisions since *Brown* have continued to proceed from the premise that mere firearm possession during flight will not satisfy the § 3C1.2 enhancement. *See United States* v. *Porter*, 643 F. App'x 758, 760 (10th Cir. 2016) (affirming application of § 3C1.2 enhancement because armed defendant fled from officers on foot and dropped a "fully-loaded, Glock 40-caliber semiautomatic pistol with a live chambered round"); *United States* v. *Hampton*, 100 F. App'x 792, 794 (10th Cir. 2004) (affirming application of § 3C1.2 enhancement because armed defendant fled from officers on a bicycle, riding at high speeds in an apartment complex, and crashed while carrying a loaded gun), *overruled on other grounds by Hampton* v. *United States*, 543 U.S. 1109 (2005).

revolver to throw it and throwing the revolver could have caused it to accidentally discharge. *Id.* at 323–24. The Fourth Circuit reversed. "[N]o evidence support[ed] the district court's finding that [the defendant] reached for the gun," and "the [g]overnment ha[d] not identified any evidence from which the district court could have concluded that there was a substantial risk of the firearm discharging when it hit the ground." *Id.* at 325. The Fourth Circuit rejected the government's contention that the "imposition of the § 3C1.2 enhancement was warranted because [the defendant] fled while holding a loaded firearm." *Id.* at 326. That approach was not consistent with the "plain language of § 3C1.2." *Id.* "Had the Sentencing Commission wanted this enhancement to apply to mere armed flight instead of to flight plus a specific finding of reckless creation of risk," the Fourth Circuit reasoned, "it could have written the Guideline in that way." *Id.*[8]

Other circuits considering the § 3C1.2 enhancement in the context of firearm possession during flight have reached similar conclusions. *See United States* v. *Mukes*, 980 F.3d 526, 538 (6th Cir. 2020) (reversing

---

[8] The Fourth Circuit recently reaffirmed its holding in *Shivers*, stating again "flight-plus-something more" must support the application of § 3C1.2. *United States* v. *Henderson*, 88 F.4th 534, 538 (4th Cir. 2023) (quoting *Dennings*, 922 F.3d at 237).

application of § 3C1.2 when defendant dropped a loaded firearm during flight because evidence did not show the firearm was "actually cocked" or otherwise "capable of discharging in its condition"); *see also United States* v. *Brown*, 31 F.4th 39, 47–49 (1st Cir. 2022) (affirming application of § 3C1.2 because "something more" than possessing a firearm during flight is required and evidence showed that a loaded firearm fell out of defendant's pocket while he struggled with an officer); *United States* v. *Matchett*, 802 F.3d 1185, 1197–98 (11th Cir. 2015) (affirming application of § 3C1.2 because armed flight "alone is insufficient" but evidence showed defendant possessed a loaded firearm in his pocket that "could have accidentally discharged" while resisting arrest).[9]

With these principles in mind, we consider the arguments before us.

## B

Mr. Zamora argues his armed flight did not recklessly create a substantial risk of death or bodily injury to another person. The district court rejected this argument, and so do we.

## 1

Mr. Zamora first contends the district court clearly erred in finding his armed flight was reckless. As Mr. Zamora sees it, the district court did not

---

[9] We are aware of no circuit decision holding otherwise.

18

accept the government's theory that the Glock necessarily fired because his finger was on the trigger, and no other evidence suggests he carried the Glock in a manner that so deviated from the standard of care "that a reasonable person would not undertake it." Aplt. Br. at 22. We are not persuaded.

Here, the district court reasoned Mr. Zamora acted recklessly by fleeing from law enforcement with "a fully loaded Glock, with a round in the chamber, not being carried in a holster, where it discharged." App. II at 121. The district court further found, based on the testimony at the second sentencing hearing, "the absence of a holster plus the cocked gun with a round in the chamber and running from law enforcement, where the gun discharged . . . does show reckless behavior." App. II at 122. The record amply supports the district court's findings.

First, the record shows Mr. Zamora was carrying a Glock with a live round in the chamber. Special Agent Owens described the difference between a loaded Glock and a Glock with a chambered bullet. He testified that to place a live round in the chamber, "[y]ou would load the ammunition . . . into the bottom . . . then you would rack the slide and that would put a round in the chamber." App. II at 71–72. Without a chambered bullet, Special Agent Owens explained, a Glock simply will not fire. App. II at 72. And the district court focused on the conditions required for a Glock to fire during Agent Owens's testimony. It asked Agent Owens "[s]o in order for the gun to fire someone

19

would have to first put a live round into the chamber?" App. II at 72. Agent Owens replied "[y]es, ma'am." App. II at 72.

Second, both firearms witnesses agreed a Glock loaded with a bullet in the chamber can discharge accidentally even if the trigger is not pressed intentionally. Special Agent Owens testified five to seven pounds of pressure on the trigger was all that was needed for the Glock to go off, and Mr. Bahde endorsed that view. App. II at 71, 81–83. Mr. Bahde also testified that any object exerting that amount of pressure on the trigger—not just a finger—could cause a Glock to fire. App. II at 81–82; *see also id.* at 77–78.

Third, the record speaks specifically to the risks of carrying an unholstered Glock. The district court asked Mr. Bahde, the defense expert, whether guns should be carried in a holster "for safety reasons," and Mr. Bahde responded "[a]bsolutely." App. II at 83. He then explained that a gun in a holster has the "trigger guard . . . covered" and once a gun is in a holster "it is very difficult for anything to get in between [the trigger and holster]." App. II at 83–84. According to Mr. Bahde, it was atypical for someone to carry a gun like Mr. Zamora did that night—between the waistband of his pants and his underwear. He testified he did not know "of anybody that teaches for a living that would recommend you put a pistol in your pants without a holster." App. II at 84. Mr. Bahde also emphasized the risk to both Mr. Zamora and others of carrying a gun in such a manner. He testified it was "not particularly safe" to

20

carry a gun unholstered with a round in the chamber while running and that he would not recommend it because "that trigger is not protected." App. II at 87.

Under these circumstances, the district court did not clearly err in finding the manner in which Mr. Zamora carried the Glock while fleeing law enforcement was reckless. Mr. Zamora resists this conclusion, however. He insists the Glock's safety features made the risk of an accidental discharge exceedingly low, which shows his conduct was not a gross deviation from the standard of care. It is true Agent Owens testified generally that Glocks have several safety mechanisms designed to prevent against accidental discharges. But § 3C1.2 applies the standard of care of a reasonable person, "not the reasonable fleeing criminal suspect." *Conley*, 131 F.3d at 1389. Here, the experts testified a reasonable person would not have carried a loaded Glock like Mr. Zamora.[10]

---

[10] To the extent Mr. Zamora argues on appeal the government did not produce evidence about the reasonable standard of care for carrying a Glock, he did not raise that argument before the district court, and we decline to address it now on appeal. *See Simpson* v. *Carpenter*, 912 F.3d 542, 565 (10th Cir. 2018) ("To properly raise an argument below, a litigant must present the argument 'with sufficient clarity and specificity.'"(quoting *Folks* v. *State Farm Mut. Auto. Ins. Co.*, 784 F.3d 730, 741 (10th Cir. 2015))). Even considering that argument, it would not advance Mr. Zamora's appellate position. The only meaningful evidence on the standard of care came from Mr. Zamora's expert witness, who testified he would not recommend carrying a Glock unholstered because of the safety risks it posed.

The testimony at the second sentencing hearing confirmed having a chambered bullet in the Glock heightened the risk of an accidental discharge. Mr. Zamora does not dwell on this testimony, which further supports the recklessness finding. U.S.S.G. § 2A1.4 cmt. n.1 (defining "reckless" for application of § 3C1.2); App. II at 71–72, 122. *United States* v. *Lard*, a case relied on by Mr. Zamora, helps make our point. There, the Seventh Circuit affirmed application of the § 3C1.2 enhancement when an armed defendant fled from law enforcement officers and tossed to the ground a loaded gun with a round in the chamber. 327 F.3d 551, 554 (7th Cir. 2003). Throwing a gun "fully capable of firing," the court of appeals reasoned, created a risk of serious injury to the pursuing officers. *Id.*; *see also Brown*, 31 F.4th at 49 n.13 (§ 3C1.2 applied because it is "reasonable to conclude that a gun that contains a bullet possesses a probability of accidental firing"); *Matchett*, 802 F.3d at 1198 (§ 3C1.2 applied because the evidence showed "there was a significant chance that [a] firearm could have accidentally discharged"); *United States* v. *Kelley*, 40 F.4th 276, 285 (5th Cir. 2022) (§ 3C1.2 applied because running from officers while carrying a gun "capable of discharging grossly deviates from the standard of care" of a reasonable person); *United States* v. *Gray*, 942 F.3d 627, 632 (3d Cir. 2019) (§ 3C1.2 applied because "a *loaded* firearm" thrown "in the vicinity of a police officer and at least one civilian" could have "discharged when thrown").

So too here. The record established the Glock carried by Mr. Zamora was loaded and ready to fire such that accidental or intentional discharge was a factual possibility. That the district court could not determine exactly why Mr. Zamora's gun discharged is not dispositive. As the district court correctly put it, "either way," Mr. Zamora's conduct satisfied the standard for recklessness to warrant application of the enhancement. App. II at 122.

## 2

Mr. Zamora next insists his armed flight, even if reckless, created no substantial risk of death or bodily injury to another person. According to Mr. Zamora, he was the only person actually injured when the Glock went off. Mr. Zamora maintains the streets were empty when he fled from law enforcement that night, Aplt. Br. at 2, 14–15, 34–35, and says "there were no cars and no officers and no risk for § 3C1.2 to punish." Aplt. Br. at 35. He further claims the "district court made no finding that there was any traffic at the time or that [his] flight endangered anyone." Aplt. Br. at 35.

Mr. Zamora is correct that only he sustained an injury when the gun discharged. To the extent Mr. Zamora argues the § 3C1.2 enhancement does not apply to a risk of injury *to the defendant*, we agree. The plain text of the Guidelines requires a defendant to create a substantial risk of harm "to *another* person." U.S.S.G. § 3C1.2 (emphasis added). And the Guidelines commentary defines "[a]nother person" to include "any person, except a

participant in the offense who willingly participated in the flight." *Id.* cmt. n.4. That principle does not help Mr. Zamora because the district court did not rely on the harm to him to apply the enhancement. The district court found Mr. Zamora's actions "created a serious risk of bodily injury *to law enforcement*." App. II at 122 (emphasis added). This finding is not clearly erroneous. Mr. Zamora has not meaningfully attempted to argue otherwise, and we doubt such an argument would succeed. *See, e.g.*, *Young*, 893 F.3d at 780 (affirming application of the reckless-endangerment enhancement where the district court focused only on the danger to pursuing officers).

Mr. Zamora's argument also ignores a critical fact: the presence of an occupied car in the Taco Bell drive-thru, parked in immediate proximity to where Mr. Zamora's gun went off.[11] The government brings this aspect of the record to our attention in its Answer Brief, but Mr. Zamora replies— correctly—the district court never mentioned it. That is no matter. "[I]t is axiomatic that ordinarily we may affirm 'on any ground that finds support in the record.'" *United States* v. *Garcia*, 946 F.3d 1191, 1207 (10th Cir. 2020) (quoting *United States* v. *Richards*, 27 F.3d 465, 468 (10th Cir. 1994)); *see also Safe Streets All.* v. *Hickenlooper*, 859 F.3d 865, 879 (10th Cir. 2017) (We

---

[11] Although the government on appeal relies on the presence of the car in the Taco Bell drive-thru, it did not meaningfully emphasize that fact before the district court. This might help explain why the district court did not make more of this fact in its analysis.

24

"can affirm a lower court's ruling on any grounds adequately supported by the record, even grounds not relied upon by the district court." (quoting *Elwell* v. *Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012))).

Here, we will not turn a blind eye to what the body camera footage obviously establishes—Mr. Zamora running directly in front of an occupied vehicle while fleeing from law enforcement moments before the loaded gun he is carrying goes off.



Mr. Zamora collapsed almost immediately after the gun went off, falling to the sidewalk a few feet away. Under these circumstances, we have no trouble concluding Mr. Zamora's armed flight created a substantial risk of serious bodily injury to another person.

We thus affirm the district court's decision to apply the two-level enhancement in § 3C1.2.

## III

Mr. Zamora's sentence is **AFFIRMED**.