FILED
United States Court of Appeals
Tenth Circuit

February 21, 2025

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KONG MENG LOR,

    Defendant - Appellant.

No. 24-1172
(D.C. No. 1:23-CR-00348-NYW-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges.
_____

## I.    INTRODUCTION

Kong Meng Lor pleaded guilty to one count of illegally possessing

ammunition as a felon. *See* 18 U.S.C. § 922(g)(1). At sentencing, the district court

increased Lor's offense level by four pursuant to U.S.S.G. § 2K2.1(b)(6)(B) when

deciding his Guidelines sentencing range. On appeal, Lor challenges the application

of § 2K2.1(b)(6)(B) by arguing the district court based its decision upon a clearly

erroneous factual finding. The district court did not clearly err in concluding Lor

illegally possessed the ammunition in connection with a Colorado car-theft felony

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

offense. Therefore, exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, this court **affirms** the district court's sentence.

## II.     BACKGROUND

Lor was caught driving a stolen 1995 Honda Civic. He was arrested at the scene. After waiving his *Miranda* rights, Lor admitted he knew the Civic was stolen. He also indicated he was carrying a gun. A search of his person revealed Lor had a black 9mm semi-automatic handgun with a loaded magazine and a separate loaded magazine attached to a holster. Because he had prior felony convictions, Lor was indicted on a single count of unlawfully possessing ammunition in violation of § 922(g)(1). He pleaded guilty without a plea agreement.

The Presentence Investigation Report ("PSR") concluded Lor's offense level should be increased by four pursuant to § 2K2.1(b)(6)(B). The PSR reasoned the enhancement should apply because Lor possessed the ammunition in connection with his arrest for driving the stolen 1995 Civic. Lor objected to the PSR, identifying Colorado's aggravated motor vehicle theft as the relevant criminal statute. *See* Colo. Rev. Stat. § 18-4-409. Instead of denying he was guilty of motor vehicle theft, Lor argued the government failed to meet its burden of establishing by a preponderance of the evidence that his offense was a felony. In particular, he argued his theft of the Civic amounted to a felony under § 18-4-409 only if the vehicle was worth at least $2000 but that the government had presented no evidence establishing the value of the vehicle.

2

At the sentencing hearing, the district court considered the PSR, objections to the PSR, documents attached thereto, and the parties' arguments. The district court concluded the government had indeed established, by a preponderance of the evidence, that Lor possessed ammunition in connection with another felony offense. *See* Colo. Rev. Stat. § 18-4-409(4)(b). Underlying this conclusion was the district court's finding that the value of the 1995 Civic exceeded $2000. Applying the four-level enhancement in accordance with § 2K2.1(b)(6)(B), the district court determined Lor's advisory Guidelines range was 46 to 57 months. Ultimately, Lor was sentenced to serve a 40-month term of imprisonment, which reflected a downward variance.

## III.    DISCUSSION

"A challenge to the application of a sentencing enhancement tests the procedural reasonableness of a sentence, which requires, among other things, a properly calculated Guidelines range." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (quotation omitted). "When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Zamora*, 97 F.4th 1202, 1207-08 (10th Cir. 2024) (quotation omitted).

Lor challenges the district court's application of the offense level enhancement set out in § 2K2.1(b)(6)(B). Section 2K2.1(b)(6)(B) instructs the sentencing court to increase a defendant's offense level by four if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." The district court

3

applied the enhancement, finding Lor possessed ammunition in connection with felony aggravated motor vehicle theft under Colorado law. *See* Colo. Rev. Stat. § 18-4-409 (2022).[1] The relevant provision of the Colorado statute states that a person commits felony aggravated motor vehicle theft if "the value of the motor vehicle or motor vehicles involved is two thousand dollars or more." *Id.* § 18-4-409(4)(b). In contrast, if the value of the vehicle involved is less than $2000, the offense is considered a misdemeanor. *See id.* § 18-4-409(4)(c).

Lor raises a single issue on appeal. He argues the government failed to satisfy its burden of establishing the value of the stolen vehicle was $2000 or more. He claims the district court's finding to the contrary was therefore clearly erroneous.

"To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. Cook*, 550 F.3d 1292, 1295 (10th Cir. 2008) (quotation omitted).

---

[1] After Lor's offense, but before the sentencing hearing, the Colorado General Assembly amended the aggravated motor vehicle theft statute. *Compare* Colo. Rev. Stat. § 18-4-409(4)(b) (2022) (defining as a class six felony, the theft of a vehicle the value of which is two thousand dollars or more but less than twenty thousand dollars), *with id.* § 18-4-409(4) (2023) (defining as a class five felony, the theft of a vehicle, regardless of its value). For the purposes of § 2K2.1(b)(6)(B), the relevant iteration of the felony statute is the one in effect at the time the offense was committed. *See United States v. Whitehead*, 425 F.3d 870, 871-72 (10th Cir. 2005); *see also United States v. Alibegic*, 34 F.4th 1122, 1123 (8th Cir. 2022). As did the district court, we focus on the version of the statute in effect at the time of the offense.

The parties argue at length about what evidence the district court should or should not have considered.[2] It is undisputed, however, that the Kelley Blue Book Pricing Report ("Pricing Report") is a relevant piece of evidence because it provides a record of "the sale price of other similar property." *People v. Thornton*, 251 P.3d 1147, 1149-51 (Colo. App. 2010); *see* Colo. Rev. Stat. § 18-4-414(2). The Pricing Report is sufficient evidence to establish the district court did not clearly err.

The Pricing Report was attached to Lor's written objections to the PSR. A law enforcement officer who interviewed the car-theft victim obtained the Pricing Report by inputting the vehicle's information into the pricing tool available on the Kelley Blue Book website. The Pricing Report is composed of two main parts. The first part reveals the valuation itself. It assesses the value of a 1995 Honda Civic as $1939 if sold to a "[p]rivate [p]arty," with 38.7% deviation spanning either direction, yielding a range of $1188 to $2689. The second part lists the configured options which were considered in estimating the value of the vehicle. This part lists "pre-selected options" which are considered "typical equipment" for a vehicle given its year, make, and model. It also indicates, with a check mark, any of the options added by the user. Pre-selected options include, but are not limited to, engine specifications and type of

---

[2] To support its position that the 1995 Civic was worth at least $2000, the government filed, among others, four Facebook Marketplace listings and an incident report involving the theft of a 1996 Honda Civic Hatchback in which the spouse of the car-theft victim estimated that different car's value. Although the parties dispute the relevance and evidentiary weight of these exhibits, there is no need to address them because the Kelley Blue Book is sufficient to resolve the issue on appeal.

steering. Check marks on the Pricing Report indicate the vehicle's black color and automatic transmission were added by the officer.

## A. Valuation

Lor argues the Pricing Report affirmatively establishes the district court clearly erred in its factual finding. He emphasizes how both the median value and a preponderance of the values within the valuation range fall below the $2000 threshold.[3] The government responds by claiming the median value is not dispositive evidence of the vehicle's value. The government instead suggests the range of values provided in the Pricing Report represents the "numerous values" for a 1995 Honda Civic.

Under Colorado law, the value of a stolen property "may be established through the sale price of other similar property." Colo. Rev. Stat. § 18-4-414(2). The Colorado Court of Appeals has held that a Pricing Report represents a "market report" which "indicates the sale price of other similar property." *Thornton*, 251 P.3d at 1149-50.  The contents of the Pricing Report suggest Kelley Blue Book considers as similar those vehicles with the same year, make, model, approximate mileage, and options. Vehicles which share these attributes, however, may not be identical nor valued the same. For example, the vehicle's accident history or cosmetic features

---

[3] Here, by referencing a preponderance of the values, Lor alludes to the fact that more than half of the values in the Pricing Report's valuation range fall below the $2000 threshold. Indeed, with a median value of $1939 and 38.7% deviation spanning in either direction, approximately 54% of the values in the range are below $2000.

may affect its valuation. The Pricing Report reflects an accumulation of sale prices of comparable, but not identical, vehicles. Consequently, no one value within the value range is likely to be dispositive; rather, the valuation of any specific vehicle is more likely to be "based thereon." *Id.* at 1150.

Two aspects of the Pricing Report support this understanding. First, the Pricing Report presents the vehicle's estimated value not as a stand-alone determination, but as the median of the "estimated range of the [vehicle's] fair market value." *People v. Burgess*, No. 24CA0123, 2024 WL 4850491, at *1 (Colo. App. Nov. 21, 2024) (unpublished). Because the range itself is an estimate based on sale prices of similar vehicles, price points within the range are presumably relevant, but not determinative. Second, the record indicates Kelley Blue Book estimates the value of any one vehicle based, at least in part, on "pre-selected options" which, in turn, are based on equipment that is "typical" of similar cars. Neither party argues that the Kelley Blue Book pricing tool has the capacity to consider every single option or attribute on a vehicle, even though such options and attributes are likely to affect its valuation. *See id.* at *1, 3 (affirming the trial court's finding, based on the owner's testimony, that the vehicle's value would be at the "high end of the estimate" because the car was purchased new and cared for).

Thus, the Pricing Report is best understood as evidence which provides a range of reasonable values of the vehicle based on certain factors. The ultimate determination of the vehicle's value should be based on how a factfinder weighs the

Pricing Report as evidence. *See Thornton*, 251 P.3d at 1150 (citing *Beaudoin v. People*, 627 P.2d 739, 741 (Colo. 1981) (en banc)).

### B. Configured Options

Lor maintains the Pricing Report shows the car's value does not exceed $2000 because the $1939 valuation represents an overestimation. He argues the $1939 is an overestimation because the officer who obtained the Pricing Report did not enter the vehicle's exterior damage into the Kelley Blue Book pricing tool. Lor cites to the record which suggests the vehicle had both a dent in the front on the passenger's side as well as damage to the headlight on the passenger's side. The government concedes the exterior damage was not reflected in the valuation. It argues, however, that the car's mechanical condition was also omitted from the assessment. The car-theft victim mentioned to the officer how her vehicle was "mechanically very well taken care of and runs without any mechanical issues." Lor, on the other hand, argues the officer did, in fact, input the vehicle's mechanical condition into the pricing tool. He cites to the part of the record in which the officer suggests the information he entered into the pricing tool was based on statements from the car-theft victim.

There are two parts of the record which most directly speak to how the Pricing Report was generated: an incident report from the officer and the Pricing Report itself. The incident report stated, in relevant part, as follows:

> [The victim] advised that her vehicle was mechanically very well taken care of and runs without any mechanical issues. Based on this information[,] the vehicle was entered into Kelly [sic] Blue Book with the vehicle's specific VIN number and milage [sic].

8

From these statements, it appears the officer entered the vehicle's VIN number and mileage into the Kelley Blue Book pricing tool while leaving out its exterior damage. The statements, however, do not establish whether the officer input the mechanical condition of the vehicle. This is because it is unclear how the officer entered the vehicle into the pricing tool "[b]ased on" the information provided by the car-theft victim. This uncertainty is not clarified by the second part of the Pricing Report. That part is silent on whether it reflects the mechanical condition or the exterior damage to the vehicle. On its face, the report suggests the only options added to the pricing tool were the exterior color and the transmission of the 1995 Civic. Thus, the district court was within its discretion to conclude the Pricing Report did not reflect circumstances argued by either party.

## C. The District Court's Valuation

The district court was required to determine the value of the 1995 Civic based on the record which was unclear as to whether the car's mechanical condition or exterior damage was included in the Pricing Report. The district court could thus reasonably conclude that good mechanical condition of a vehicle would have a positive impact on its valuation. It would have been equally reasonable to conclude that good mechanical condition would be far more important than exterior damage to a purchaser of an almost thirty-year-old 1995 Civic sedan. It follows that the district court could reasonably conclude, on balance, that if both the Civic's exterior cosmetic damage and sound mechanical condition were factored in, the value of the car would be more than $61 higher than the median value set out in the Pricing

9

Report. The district court's finding that the value of the 1995 Civic exceeds $2000 is neither implausible nor impermissible given the record on appeal.[4] That finding therefore does not rise to the level of clear error. *See Cook*, 550 F.3d at 1295.

## IV.    CONCLUSION

Lor has not shown that the district court clearly erred when it found that the value of the vehicle was $2000 or more. We therefore affirm the district court's sentence. Lor's pending motion to expedite is denied as moot.

Entered for the Court

Michael R. Murphy
Circuit Judge

---

[4] To seek this enhancement, the government needed only to establish that the value of the vehicle was at least $2000. *See* Colo. Rev. Stat. § 18-4-409(4)(b) (2022). The sentencing court, however, found that the government had "proffered sufficient evidence [to establish] that the value of the car exceeds $2000 by a preponderance of the evidence."