RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SHEILA MIKEL,

　　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

MARGIE QUIN, Commissioner of the Department of
Children's Services, in her official capacity; JENNIFER
NICHOLS, in her individual capacity; TENNESSEE
DEPARTMENT OF CHILDREN'S SERVICES; OMNI
VISIONS, INC.,

　　　　　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
│
│
│  No. 22-5329
│
│
│
│
│
┘

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:20-cv-00345—Curtis L. Collier, District Judge.

Argued: October 19, 2022

Decided and Filed: January 19, 2023

Before: SUTTON, Chief Judge; BOGGS and KETHLEDGE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** William Neil Thomas III, THOMAS & THOMAS, Chattanooga, Tennessee, for
Appellant. Jordan K. Crews, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for state of Tennessee Appellees in their official capacities. Jeffrey M.
Beemer, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee Omni Visions. **ON
BRIEF:** William Neil Thomas III, THOMAS & THOMAS, Chattanooga, Tennessee, for
Appellant. Jordan K. Crews, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for state of Tennessee Appellees in their official capacities. Jeffrey M.
Beemer, Daniel D. Choe, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee
Omni Visions.

---

**OPINION**

---

SUTTON, Chief Judge. Sheila Mikel claims that the Tennessee Department of Children's Services took her two foster children without due process of law. She sued the Department, its Commissioner, and a private Department subcontractor, seeking damages along with declaratory and injunctive relief. The district court dismissed Mikel's claims against the Department and Commissioner for want of jurisdiction and held that Mikel had failed to state a claim against the subcontractor. We affirm.

I.

The Tennessee Department of Children's Services supervises Tennessee's foster care system. *See* Tenn. Code Ann. §§ 37-5-105(3), 37-5-106(a)(1), (3). An appointed Commissioner, now Margie Quin and previously Jennifer Nichols, leads the Department. The Department subcontracts much of its day-to-day work to private foster care agencies, including Omni Visions, Inc.

Plaintiff Sheila Mikel is a resident of Tennessee. In June of 2016, Mikel took custody of two Tennessee girls—"AK," then twelve years old, and "SK," then nine years old—as a foster parent. Mikel describes her relationship with AK and SK as "pre-adoptive," R.1 at 3, meaning that she had planned to adopt the girls after taking custody of them. Omni approved Mikel's home as a foster home and oversaw Mikel's relationship with the girls.

All was well until December 2017, when Mikel submitted her adoption papers to Omni. Omni removed the girls from Mikel's custody three days later, alleging emotional abuse. About a week after that, Omni "clos[ed] [Mikel's] home as a foster home." *Id.* at 6. Mikel says that she never abused the girls, that Omni's removal was pretextual and in violation of Tennessee law, and that neither Omni nor the Department gave her notice or an opportunity to be heard before commencing the removal process.

After unsuccessfully appealing Omni's removal administratively and in state court, Mikel filed this action against Omni, the Department, and then-Commissioner Nichols. In her complaint, Mikel alleged claims arising under Tennessee tort law and § 1983. She demanded damages from Omni, costs and expenses, and two injunctions—one limiting the defendants' rights to remove future foster children, one preventing the defendants from "assisting in any adoption" of the girls. *Id.* at 11. She also sought declaratory relief.

The Department, Nichols, and Omni filed motions to dismiss. The district court granted the motions. It held that Tennessee's sovereign immunity blocked Mikel's suits against the Department and Nichols in her official capacity, that Mikel had not properly served process on Nichols in her individual capacity, and that Mikel had failed to state a claim against Omni under § 1983. It then declined to exercise supplemental jurisdiction over Mikel's state-law claims. Mikel appealed.

## II.

Sovereign immunity generally bars lawsuits against States or their agencies. *See, e.g.*, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2461–62 (2022). While a State may waive its immunity from suit, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618–19 (2002), Mikel does not claim that Tennessee has waived anything here. And while Congress can abrogate a State's sovereign immunity to enforce the Fourteenth Amendment, it did not do so when it enacted § 1983. *Quern v. Jordan*, 440 U.S. 332, 342–43 (1979). State entities in fact are not "persons" under § 1983 in the first place. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, to the extent Mikel seeks relief against Tennessee agencies, her lawsuit fails twice over—first due to sovereign immunity, second due to the inapplicability of § 1983.

Sovereign immunity also limits, but does not entirely prohibit, lawsuits against state officials in their official capacity. Under *Ex parte Young*, 209 U.S. 123, 159–60 (1908), federal courts may award injunctive and declaratory relief against state officials when the relief is "designed to end a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see, e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437–38 (2004). They may not, however, entertain actions that essentially seek a monetary recovery from a State. *Edelman v.*

*Jordan*, 415 U.S. 651, 663 (1974). Put differently, *Ex parte Young* applies only when a plaintiff targets "an ongoing violation of federal law and seeks" prospective relief. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotations omitted).

As to Mikel's lawsuit against the Department, there is little room to maneuver. The Department is a state agency. *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003). Sovereign immunity thus protects it, full-stop. *Id.* Plus, the Department is not a "person" under the statute anyway. *Will*, 491 U.S. at 71.

The same is not true for the current Commissioner, Quin. True, if Mikel had sought money damages from Quin in her official capacity, sovereign immunity would have stood in her way. *E.g.*, *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). But Mikel's complaint did not demand damages from Quin or otherwise seek recovery of money from the State of Tennessee. Mikel instead alleged that Quin violated federal law in depriving Mikel of her foster children and sought declaratory and injunctive relief. That kind of claim sits well within the heartland of *Ex parte Young*.

It makes no difference whether Mikel's § 1983 claim fails on the merits. To ascertain whether sovereign immunity defeats an action seeking injunctive relief against a state official, we ask only whether the action *alleges* an ongoing violation of federal law. *Verizon*, 535 U.S. at 646. We do not ask whether the allegation is true. Because Mikel's complaint seeks to state a claim for a violation of federal law, it falls outside the scope of Tennessee's sovereign immunity.

Nor is it true that Mikel failed to allege an "ongoing" violation of federal law. She alleges that Quin and the Department unlawfully took AK and SK from her, surely an "ongoing" or "continuing" action. *See In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020). The girls indeed remain outside Mikel's custody to this day. Just as state officials may commit "ongoing" violations when they unconstitutionally retain possession of a person's identifiable property, *see, e.g.*, *Tindal v. Wesley*, 167 U.S. 204, 221–22 (1897); *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697–98 (1982) (plurality op.), so the same may be true when they keep children they allegedly have no right to keep.

All in all, while sovereign immunity bars Mikel's suit against the Department, it does not bar Mikel's claims against Quin.

### III.

That leaves Mikel's claims against Quin and Omni.  These claims run into another hurdle—standing—one Mikel can clear with respect to Omni but not with respect to Quin.  Standing requires (1) an actual injury (2) caused by a defendant's challenged conduct (3) that a favorable decision likely will redress.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[A] plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

*Damages and attorney's fees.*  Mikel seeks damages only from Omni, and she has standing to pursue them.  When Omni took AK and SK away from Mikel, Mikel suffered an injury.  *Chafin v. Chafin*, 568 U.S. 165, 172–73 (2013).  Omni inflicted that injury by participating in the removal process.  And even a dollar in damages would help mitigate the injury that Omni inflicted.  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021).  That adds up to standing.

Mikel's standing to seek costs and attorney's fees follows from her standing to seek damages.  An interest in recovering litigation expenses, to be sure, does not create standing on its own.  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).  When a litigant has standing to seek damages, however, she has standing to recover fees and costs as well.  *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107–08 (1988).  Because Mikel has standing to seek damages, she has standing to seek attorney's fees too.

*Injunctive relief.*  Mikel also seeks two injunctions:  one limiting "further activity" by the defendants "[i]nvolving the removal of children from foster homes," and another barring the defendants from "assisting in" any future adoption of AK or SK.  R.1 at 11.  But these injunctions would not redress Mikel's injuries, meaning Mikel lacks standing to seek them.

Injunctions redress "present ongoing" or "imminent future" injuries.  *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curiam).  Injuries are "present"

when they have already come about, and "imminent" when they are certain or perhaps substantially likely to occur in the future. *Id.* at 981–82; *compare Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013), *with Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

A "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. When a litigant seeks to remedy a procedural wrong, she instead needs only to show "some possibility" that an injunction will afford her redress. *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014) (quotations omitted). But "a bare procedural violation, divorced from any concrete harm," is not a present or imminent injury that an injunction can redress. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016).

These principles create problems for Mikel's demands for injunctive relief against Quin and Omni. Start with Mikel's injuries. Mikel suffered a present, ongoing injury when she lost custody of her girls. That loss, however, is the only injury supporting Mikel's standing theory. Among other things, Mikel has not pled that she plans to foster more children going forward. As a result, she cannot argue that she faces "imminent" risks of losing future foster children. *Cf. Clapper*, 568 U.S. at 401–02; *Driehaus*, 573 U.S. at 158. Likewise, although the defendants allegedly deprived Mikel of custody over her girls without adequate process, Mikel did not suffer a separate injury from the inadequate process she received. Divorced from AK and SK, such an injury would be a "bare procedural violation" insufficient for standing by itself. *Spokeo*, 578 U.S. at 341–42.

Losing custody of AK and SK, in turn, is not an injury that either of Mikel's proposed injunctions against Quin and Omni could redress. Recall that Mikel sought an injunction restricting removal of future foster children and another preventing the defendants from "assisting in" any adoption of the girls. R.1 at 11. Neither injunction, however, creates even "some possibility" of returning AK or SK to Mikel. *Klein*, 753 F.3d at 579 (quotations omitted). AK and SK have already been removed, so limiting future foster-child removals would not alter AK or SK's custody status. And while barring Omni or Quin from assisting in AK or SK's adoption might prevent AK or SK from being adopted, this outcome would not return them either. Mikel has not said that she presently intends to adopt AK or SK and has not otherwise

explained how an injunction against adoption would protect her concrete interests.  Given this reality, whether AK and SK get adopted or not, they will still remain outside Mikel's hearth and home.

*Declaratory relief.*  Mikel requests two declaratory judgments:  one establishing that the contract between Omni and the Department is void and another announcing "a violation of 42 U.S.C. § 1983."  R.1 at 11.  Both requests fail.

Declaratory judgments are not get-out-of-standing-free cards.  Because federal courts may not issue advisory opinions, all declaratory judgments must have "a conclusive character." *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 241 (1937).  A declaratory judgment, put differently, may issue only when "it is substantially likely" to redress a plaintiff's actual or imminent injuries.  *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality op.); *see, e.g.*, *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 75–76 & n.20 (1978); *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 971 (6th Cir. 2009) (explaining that a declaratory judgment must "affect[] the behavior of the defendant towards the plaintiff" (emphasis omitted) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987))).

Neither of Mikel's proposed declaratory judgments has a "conclusive character." *Haworth*, 300 U.S. at 241.  For starters, declaring that Omni's contract with the Department is void would not redress any injuries Mikel has suffered.  Omni issued AK and SK's removal notice long ago.  Hence voiding Omni's contract would not lead AK and SK to return to Mikel.  And because Mikel does not operate a foster home now and has not suggested that she intends to do so later, Mikel lacks a legally cognizable interest that could support an award of prospective relief.  *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).

So too for a "[d]eclaration of a violation of 42 U.S.C. § 1983."  R.1 at 11.  The problem, as before, is that Mikel does not explain how a declaratory judgment of this sort would offer her redress.  Entering the realm of the possible and the hypothetical, we suppose, it could be said that a declaratory judgment could raise the odds that the Department would return the children.  But Mikel's complaint made no such suggestion, leaving this hypothetical no less hypothetical than

many other speculative possibilities. Because Mikel has not argued anything to this effect, we see no good reason to tread where Mikel has not.

All in all, while Mikel has standing to seek attorney's fees and damages from Omni, she lacks standing to seek injunctive or declaratory relief against Omni or Quin.

IV.

Jurisdictional brambles cleared, we turn to the merits. Mikel sought damages only from Omni, the last party standing as it were. And the only claim left against Omni is Mikel's due process claim under § 1983.

"No state," the Due Process Clause says, shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To violate the guarantee, a "State" must "deprive" a "person" of "liberty" or "property." *Id.* Omni does not argue that it is not a "State" for Due Process purposes, and Mikel does not allege that she had a property interest in her status as a foster parent. As a result, we need ask only whether Omni deprived Mikel of "liberty" when it took AK and SK away from her.

Protected liberty interests can arise either from the Constitution itself or from state law. Neither source in this instance gave Mikel a liberty interest in her relationship with AK and SK.

*The Constitution.* The Fourteenth Amendment's promise of "liberty" encompasses, among other things, "those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). What these privileges are has never been clear, perhaps because free men pursuing happiness tend to disagree over what "long," "recognized," "essential," and "orderly" mean or ought to mean. Nor do today's facts bring things into focus: the Supreme Court has explicitly declined to decide whether foster parents have liberty interests in their relationships with foster children. *Smith v. Org. of Foster Fam. for Equal. & Reform*, 431 U.S. 816, 846–47 (1977).

Where the Supreme Court has drawn blurred lines, however, our circuit has drawn comparatively crisp ones. The key case is *Renfro v. Cuyahoga County Department of Human*

*Services*, 884 F.2d 943 (6th Cir. 1989). A family had fostered a girl for more than six years, starting when the girl was fourteen months old. *Id.* at 944. Child services took the girl away, alleging abuse. *Id.* We held that the family lacked a liberty interest in its relationship with the child. *Id.* "[T]he foster care relationship," we explained, was "a temporary arrangement created by state and contractual agreements," one which (under Ohio law) vested "limited" legal rights in the foster family. *Id.* For that reason, the family's foster relationship did not create a constitutional liberty interest. *Id.*

Mikel took custody of AK and SK under a contract with Omni and the Department. As in *Renfro*, her foster relationship with her girls was a "temporary arrangement created by state and contractual agreements," *id.*; Mikel had not adopted the girls, or for that matter come particularly close to consummating their adoption, and had not otherwise established a permanent legal relationship with them. *Id.* As in *Renfro*, that means Mikel lacked a constitutional liberty interest in her status as a foster parent. *Id.*

Mikel seeks to distinguish *Renfro* in three ways, none persuasive. First, Mikel says, her relationship with her girls was "pre-adoptive" rather than "temporary." But under Tennessee law, foster relationships, pre-adoptive or not, are designed to be temporary. Dawn Coppock, *Coppock on Tennessee Adoption Law* 226–27 (7th ed. 2017). The temporary nature of Tennessee foster placements "provides sufficient notice" to foster parents like Mikel "that their rights are limited." *Renfro*, 884 F.2d at 944.

Second, Mikel continues, a court had terminated the girls' biological parents' rights before Mikel took custody of them. Terminating the girls' parents' rights is a necessary step on the path to adoption. Diminishing the girls' biological parents' rights, however, does not greatly expand Mikel's. Mikel's relationship with the girls remains "created by state and contractual agreements" regardless of the girls' biological parents' rights. *Id.*

Third, Mikel concludes, Tennessee law gives foster parents preference in adoption proceedings. Undeniably, Tennessee law affords greater protections to foster parents than the Ohio rules at issue in *Renfro*. But the first preference to adopt that Tennessee law gives to foster parents does not, on our view, entitle them to the same constitutional protections as natural or

adoptive parents. It also does not change the reality that Mikel's relationship is circumscribed by state and contractual agreements.

Out-of-circuit cases do not change this conclusion. Mikel relies most heavily on *Elwell v. Byers*, 699 F.3d 1208, 1217 (10th Cir. 2012), where a foster family had "cared for [a foster child] nearly his entire life and [was] on the verge of adopting him," and a state court had previously approved the family's "adoption plan." *Id.* The Tenth Circuit held that this arrangement created a liberty interest. *Id.* But to recite these facts distinguishes them. Mikel did not care for the girls for their entire lives, and her adoption plan did not make it out of the starting gate. We need not decide whether a different conclusion would apply if the facts changed so materially.

*Rivera v. Marcus*, 696 F.2d 1016 (2d Cir. 1982), is further afield. In *Rivera*, a woman had fostered her half-brother and sister. *Id.* at 1024. She had lived "as a family" with the children for many years before entering into a formal foster arrangement, and the biological mother had "expressly asked" the claimant to parent the children. *Id.* The Second Circuit found a constitutional liberty interest. *Id.* at 1024–25. Here, by contrast, Mikel neither lived with nor shared a blood relationship with the girls before taking custody of them as a foster parent.

Mikel's other out-of-circuit cases, if anything, cut against her position. *See, e.g.*, *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 814 (11th Cir. 2004) (rejecting view that foster parents possess liberty interests in foster relationships because, in regulating foster relationships, "the state is not interfering with natural family units that exist independent of its power, but is regulating ones created by it"). Other out-of-circuit cases squarely reject views analogous to Mikel's. *See, e.g.*, *Rodriguez v. McLoughlin*, 214 F.3d 328, 337 (2d Cir. 2000) (holding that no liberty interest arises in foster arrangements between "biologically unrelated" persons, and distinguishing *Rivera* because it involved a blood relationship).

*Tennessee law.* Tennessee law might also vest Mikel with a liberty interest in foster parenting. "State-created liberty interests arise when a state places substantive limitations on official discretion." *Tony L. ex rel. Simpson v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995) (quotations omitted). A statute places substantive limits on official discretion when it (1) contains mandatory language (2) requiring specific substantive outcomes (3) when specific

substantive predicates are met. *See, e.g.*, *Fields v. Henry County*, 701 F.3d 180, 186 (6th Cir. 2012).

Mikel offers no rule of Tennessee law that passes this test. Mikel principally cites statutes and Department rules that, she says, required the Department to offer notice and a hearing before taking away the girls. *See* Tenn. Code Ann. § 37-2-415(a)(16); Tenn. Dep't Childs. Servs. Admin. Pol'ys & Procs. 16.27. Bare notice or hearing requirements, however, do not make substantive outcomes contingent on substantive predicates. *See, e.g.*, *Fields*, 701 F.3d at 186 (hearing); *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993) (notice). They make substantive outcomes contingent on procedural predicates—the adequacy of notice or a hearing. Even if Omni violated Mikel's procedural rights under Tennessee law, that did not mean it violated her federal due process rights.

Mikel also says that Omni lacked authority under Tennessee law to remove the girls, that its removal lacked an evidentiary basis, and that it justified its removal using testimony that would have been inadmissible under the Federal and Tennessee Rules of Evidence. Even if Mikel were right as to each point, none of these facts helps her state a claim under § 1983. *See, e.g.*, *Stanley v. Vining*, 602 F.3d 767, 769 (6th Cir. 2010) ("[V]iolation of a state statute or regulation is insufficient alone to make a claim cognizable under § 1983.").

We affirm.