RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JEFFREY CAPEN,

*Plaintiff-Appellant*,

*v.*

SAGINAW COUNTY, MICHIGAN; ROBERT V. BELLEMAN,
*Defendants-Appellees*.

┐
│
│
│  No. 23-1665
│
│
┘

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:21-cv-12465—F. Kay Behm, District Judge.

Argued: March 21, 2024

Decided and Filed: June 5, 2024

Before: BATCHELDER, MOORE, and CLAY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kevin J. Kelly, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Kevin J. Campbell, CUMMINGS, McCLOREY, DAVIS & ACHO, PLC, Livonia, Michigan, for Appellees. **ON BRIEF:** Kevin J. Kelly, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Kevin J. Campbell, CUMMINGS, McCLOREY, DAVIS & ACHO, PLC, Livonia, Michigan, for Appellees.

───────────────

## OPINION

───────────────

CLAY, Circuit Judge. Plaintiff Jeffrey Capen, a former employee of Saginaw County, Michigan, appeals the district court's grant of summary judgment to Defendants Saginaw County and Robert V. Belleman. After Defendants scheduled Capen for two fitness-for-duty

evaluations, Capen brought suit under 42 U.S.C. § 1983, arguing that the fitness-for-duty evaluations violated his procedural due process rights under the Fourteenth Amendment. The district court granted Defendants' motion for summary judgment, concluding that Capen lacked a constitutionally protected interest, that he received the process he was due, and that Defendant Belleman was entitled to qualified immunity. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment to Defendants.

## I. BACKGROUND

### A. Plaintiff's Alleged Threats of Violence

From 2007 to 2021, Capen was employed as a maintenance worker in the Saginaw County Maintenance Department. During the period preceding this lawsuit, Capen worked under the supervision of Annette Taylor, who was the Maintenance Department's interim director.

Also at this time, several Saginaw County departments, including the Maintenance Department, were overseen by Defendant Robert V. Belleman, who was the Controller and Chief Administrative Officer of Saginaw County. In 2020, Belleman implemented a series of job cuts throughout the County, which resulted in Capen's reclassification to a lower-paying job in October 2020.

In December 2020, Nicholas Cooper, a co-worker of Capen's, reported that Capen had threatened to kill Annette Taylor and employees working in the Controller's Office. According to Cooper, on November 18, 2020, Capen told him that he could not wait for Taylor to leave her role as interim director and that Capen stated "fuck that bitch" regarding Taylor and "fuck them motherfuckers in the Controller Office." *See* Cooper Statement, R. 22-2, Page ID #165. Capen then allegedly stated that "it would not surprise [him] if they all ended up dead." *Id.* Cooper claims that he responded, "Come on Jeff you do not mean that," after which Capen allegedly said, "Fuck that Nick I could do it. I mean it I could!" *Id.* Capen denies making any of the above statements.

On December 6, 2020, Cooper reported this conversation to Taylor, and on December 9, 2020, Cooper submitted a written complaint to Saginaw County detailing Capen's alleged statements.

## B. Plaintiff's First Fitness-for-Duty Evaluation

Cooper's written complaint was reviewed by Belleman, who in consultation with the County's legal counsel made the decision to schedule Capen for a "fitness-for-duty" evaluation with a psychologist. At the direction of the County's undersheriff, Belleman also reached out to local law enforcement to have Capen criminally investigated.

Belleman met with Capen on December 14, 2020, to inform Capen that he had been scheduled for a fitness-for-duty evaluation and advised Capen that he had been placed on paid administrative leave. Belleman also gave Capen a letter that Capen opened after the meeting, which stated that Capen's administrative leave was "pending completion of an investigation into the statements of violence [he] made." 12/14/2020 Letter re Leave, R. 22-6, Page ID #196. The letter also stated, "You must make yourself available to assist with the investigation and any County request during this paid administrative leave. Your lack of cooperation could result in this paid administrative leave being converted to an unpaid leave of absence." *Id.* A second letter that Capen received from Belleman that day notified him that his fitness-for-duty evaluation was scheduled for the next day, December 15, at Saginaw Psychological Services, and that the evaluation was "[d]ue to a conversation [he] had with a co-worker on November 18, 2020." 12/14/2020 Scheduling Letter, R. 22-5, Page ID #193. The second letter further stated that "[i]t is mandatory that you appear for this appointment. Should you have any questions or concerns, please feel free to contact [Belleman] immediately." *Id.*

The following day, Capen appeared for his fitness-for-duty evaluation, which was administered by licensed psychologist Mark Zaroff, Ph.D. In a report following the evaluation, Dr. Zaroff stated that Capen had obvious tremors in his hands, complained of "significant memory problems," told Dr. Zaroff that he could not "independently maintain written records of activities," "relie[d] on colleagues to remind him what has been done during the day," and had been recently diagnosed with brain lesions. Zaroff Report, R. 22-8, Page ID #264–65. Based on

the above, Dr. Zaroff concluded that Capen was unable "to perform the work described in [his] current job description" and that his "neurological condition [may] ha[ve] caused personality change and/or reduced his overall ability to inhibit responses," and recommended a full neuropsychological evaluation. *Id.* at Page ID #265. Dr. Zaroff also stated that because Capen's "current neurological condition may be affecting decision making, impulse control, and personality," he likely did make the statements of violence that Cooper reported and that "the risk level would be considered moderate and should be taken seriously." *Id.* at Page ID #266.

### C. Plaintiff's Second Fitness-for-Duty Evaluation and Termination

On February 1, 2021, Belleman sent Capen a letter conveying Dr. Zaroff's opinion that Capen was unable to perform his current work and his recommendation for an additional evaluation. The letter also requested that Capen apply for short-term disability leave, asked Capen to release his medical records to the County, and requested the contact information for Capen's primary-care doctor and treating neurologist. Capen's counsel then sent Belleman a letter requesting that Capen be returned to work and advising the County that it had violated Capen's rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Capen also gave the County a physician's note stating that "Pt is seen here today. Can return to his normal duties at work." Physician's Note, R. 25-18, Page ID #508.

Approximately one month later in March of 2021, Belleman sent Capen a letter that reiterated Dr. Zaroff's findings, again asked for Capen to release his medical records, and stated that Capen was being scheduled for "an independent neuropsychological evaluation to determine whether [he] can safe[l]y perform the essential job functions of [his] position with or without an accommodation." 3/17/2021 Letter, R. 25-19, Page ID #509. By August 2021, Capen had not released his medical records or appeared for a neuropsychological evaluation.

On August 26, 2021, the County's counsel sent Capen's counsel a letter directing Capen to "participate in [an] interactive process" pursuant to the Americans with Disabilities Act and its Michigan counterpart, the Persons with Disabilities Civil Rights Act, M.C.L. § 37.1101 *et seq.*[1]

---

[1]To determine the reasonable accommodations available to an employee with a disability, the Americans with Disabilities Act's regulations direct an employer "to initiate an informal, interactive process" with the

8/26/2021 Letter, R. 25-20, Page ID #512.  According to the letter, Dr. Zaroff's findings revealed that Capen "m[ight] be unable to perform his current job duties with or without an accommodation."  *Id.*  To determine "the potential reasonable accommodations available" to Capen, the County set an "interactive process" meeting for September 8, 2021 to take place in the Saginaw County Controller's Office.  *Id.*  Because an "[e]mployee has a duty to cooperate" in the interactive process, the letter also advised Capen that his "refusal to participate in the interactive process w[ould] constitute abandonment of his position."[2]  *Id.* at Page ID #512–13.

Capen did not appear for the September 8, 2021 interactive-process meeting, and he received a termination letter on September 28, 2021, effective that day.  Two days later, Capen received a second letter "to correct and supplement" the September 28 correspondence, which stated that Capen was entitled to a pre-termination hearing.  9/30/2021 Letter, R. 25-22, Page ID #516.  The letter directed Capen to advise Belleman within a week whether he was requesting a pre-termination hearing, or his employment would be terminated on October 8, 2021.  Capen did not respond to the County, and his employment was terminated on October 8, 2021.

### D.  The Instant Lawsuit

On October 19, 2021, Capen filed this lawsuit against Saginaw County and Belleman under 42 U.S.C. § 1983, alleging a violation of his procedural rights under the Due Process Clause of the Fourteenth Amendment.  Capen specifically argued that he had a right to refuse his fitness-for-duty evaluations under the Due Process Clause and that Defendants deprived him of this right without any process.  Defendants subsequently moved for summary judgment on the grounds that Capen had failed to show a constitutional violation, that Belleman was entitled to qualified immunity, and that municipal liability was improper with respect to Saginaw County.

The district court granted Defendants' motion for summary judgment.  The district court concluded that Capen had failed to demonstrate a procedural due process violation both because

---

employee.  29 C.F.R. § 1630.2(o)(3).  The purpose of the "interactive process" is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id.*

[2]Once it is initiated, the interactive process described in the Act's regulations "is mandatory, and both parties have a duty to participate in good faith."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007).

he lacked a protected interest and because he was afforded adequate process, defeating his claims against Belleman and Saginaw County. The district court also determined that because any right Capen asserted was not clearly established, Belleman was entitled to qualified immunity. After the district court entered judgment for Defendants on July 20, 2023, Capen timely appealed.

## II. DISCUSSION

### A. Standard of Review

This Court reviews a grant of summary judgment *de novo*. *Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010). Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In resolving a summary judgment motion, this [C]ourt must view the evidence in the light most favorable to" the non-moving party. *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).

### B. Analysis

Capen argues that Defendant Belleman, a government official, and Defendant Saginaw County, a municipality, violated his constitutional rights, for which he seeks damages. A government official is shielded by qualified immunity from a suit for damages unless the plaintiff is able to demonstrate that the government official violated the plaintiff's federal statutory or constitutional rights and that such rights were "clearly established" at the time of the violation. *See Reed v. Campbell County*, 80 F.4th 734, 742 (6th Cir. 2023) (citation omitted). A municipality, in contrast to an individual government officer, is not protected by qualified immunity. *Hart v. Hillsdale County*, 973 F.3d 627, 645 (6th Cir. 2020). However, because "§ 1983 does not impose *respondeat superior* liability on municipalities," a plaintiff must demonstrate that the municipality contributed directly to the alleged violation of the plaintiff's rights through the municipality's policies or customs. *See Smith v. City of Troy*, 874 F.3d 938, 946 (6th Cir. 2017).

A common requirement for both municipal and individual liability under 42 U.S.C. § 1983 is that a plaintiff's rights under a federal statute or the U.S. Constitution must have been

violated. We begin and end our analysis with this requirement because Capen has not demonstrated a violation of his federal statutory or constitutional rights. Capen asserts that Defendants violated his constitutional rights under the Due Process Clause of the Fourteenth Amendment, which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Although the Due Process Clause has both substantive and procedural components, Capen raises only a procedural due process challenge.[3] *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). A plaintiff's procedural due process rights are violated when (1) he is deprived (2) of a constitutionally protected interest in life, liberty, or property (3) through state action and (4) the deprivation occurs without adequate process. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

Capen specifically argues that under the Due Process Clause, he possesses a constitutionally protected interest in refusing his fitness-for-duty evaluations. A fitness-for-duty evaluation may, under certain circumstances, function as "a useful procedure to determine an employee's competency to perform his duties." *Risner v. U.S. Dep't of Transp.*, 677 F.2d 36, 38 (8th Cir. 1982) (per curiam) (involving a fitness-for-duty evaluation of a Federal Aviation Administration employee). Such an evaluation may serve important goals, such as protecting the safety of employees or the public's safety at large. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565–66 (7th Cir. 2009) (concerning a fitness-for-duty evaluation of a firefighter). At the same time, an employee may have legitimate concerns about the basis for a particular fitness-for-duty evaluation and whether the evaluation meaningfully corresponds to the ability to perform one's job. Reflecting these considerations, under the Americans with Disabilities Act, fitness-for-duty evaluations must be "job-related," "consistent with business necessity," and based on evidence "that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (citation omitted). But whether fitness-for-duty evaluations trigger constitutional

---

[3]Insofar as Capen's argument can be construed as a substantive due process challenge, his appellate briefing expressly clarifies that he only raises a procedural due process challenge.

protections, and specifically implicate the Due Process Clause as Capen argues, is a distinct consideration.

Our Court does not appear to have directly addressed whether fitness-for-duty evaluations implicate the protections of the Due Process Clause. However, the decisions of other circuits offer helpful guidance. Our sister circuits have recognized that a fitness-for-duty evaluation may trigger the protections of the Due Process Clause if it deprives a government employee of a constitutionally protected property interest in his or her employment by resulting in the employee's placement on unpaid leave or termination. *See O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) (holding that the placement of a tenured public school teacher on unpaid leave for refusing a psychiatric examination implicated the teacher's procedural due process rights); *see also Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir. 1995) (observing that where a required psychiatric examination had no effect on a government employee's job status, the employee's property interest in his employment was not affected). A fitness-for-duty evaluation may also stigmatize a government employee's reputation, which our sister circuits have acknowledged could implicate due process protections if the stigma was the result of false statements and burdened the employee's job. *See Pierson*, 426 F.3d at 195; *see also Flynn*, 58 F.3d at 289; *cf. Tebo v. Tebo*, 550 F.3d 492, 503–04 (5th Cir. 2008) (involving a due process challenge to an evaluation conducted for a civil commitment proceeding). Lastly, a fitness-for-duty evaluation might also implicate a government employee's constitutionally protected right to privacy, insofar as the evaluation requires the disclosure of confidential medical information. *See Pierson*, 426 F.3d at 201–02; *Flynn*, 58 F.3d at 289–90; *Daury v. Smith*, 842 F.2d 9, 13–14 (1st Cir. 1988).

Capen does not argue that he has a protected property interest in his employment, that he experienced stigma as a result of his evaluations, or that his right to privacy was violated, unlike in the cases of our sister circuits. Instead, Capen's sole argument on appeal is that that the Due Process Clause's guarantee of liberty protects an individual's ability to refuse unwanted medical treatment, and that this protection extends to his ability to refuse his fitness-for-duty evaluations. However, the liberty interest in refusing medical treatment does not protect Capen's ability to refuse the fitness-for-duty evaluations at issue in this case.

The ability to refuse medical treatment is indeed protected by the Due Process Clause. The Supreme Court said so in *Cruzan ex rel. Cruzan v. Director, Missouri Department of Health*, when it declared that competent individuals "ha[ve] a constitutionally protected liberty interest in refusing unwanted medical treatment." 497 U.S. 261, 278 (1990). But we find it significant that Capen was not forced to accept any treatment, the very core of the right the Supreme Court identified in *Cruzan*. Capen attended a brief psychological evaluation and was scheduled for a second psychological evaluation, neither of which required him to receive a particular course of treatment. Instead, the purpose of the evaluations appeared to be descriptive. The evaluations sought to collect information from Capen and render a conclusion based on that information, rather than order him to make particular treatment decisions. While Dr. Zaroff's report summarizing the first evaluation recommended that Capen seek individual counseling because of the stress he was under, nothing in the record suggests that this was anything but a recommendation. Capen was not required to attend counseling, nor was counseling made a condition of Capen's employment. Capen was therefore not forced to seek what we would commonly understand to be treatment. *Cf. Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (concluding that the forcible administration of a drug implicated a liberty interest); *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905) (assuming that compulsory vaccination implicated a liberty interest); *Vitek v. Jones*, 445 U.S. 480, 494 (1980) (holding that involuntary psychiatric and behavioral-modification treatment while committed to a hospital implicated a liberty interest).

Additionally, the Supreme Court has declared that the right to refuse unwanted medical treatment—the only right on which Capen rests his argument—is based "on well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997). Capen's psychological evaluations to determine whether he was competent to perform his work, while no doubt personal, do not involve comparable intrusions. The fitness-for-duty evaluation Capen attended involved meeting with a psychologist to perform two standardized written and verbal tests that looked at his memory, comprehension, reading, writing, and drawing abilities. Capen does not point to any violation of his person caused by this evaluation or the second evaluation for which he was scheduled, nor did these limited

evaluations encroach on his rights in an analogous manner. From this record, Capen has failed to show that his evaluations implicate the right to refuse treatment.

The cases that Capen cites do not suggest otherwise. Capen cites, for example, *Dubbs v. Head Start, Inc.* to argue that the ability to refuse a medical examination or evaluation, like the ability to refuse treatment, implicates a protected liberty interest under the Due Process Clause. 336 F.3d 1194 (10th Cir. 2003). In that case, the Tenth Circuit held that parents who challenged their children's school medical examinations had stated a claim for a substantive due process violation. *Id.* at 1202–04. But in *Dubbs*, the children had been subject to "intrusive physical examinations," including "genital examinations and blood tests," to which the parents had not consented. *Id.* at 1197. Of course, some examinations and evaluations may disturb the traditional rights of bodily integrity and against unwanted touching on which the Supreme Court has based the protected liberty interest in refusing medical treatment. But on this record, Capen's particular psychological evaluations do not.

Capen also cites *U.S. Citizens Association v. Sebelius*, 705 F.3d 588 (6th Cir. 2013), and *Kanuszewski v. Michigan Department of Health & Human Services*, 927 F.3d 396 (6th Cir. 2019). However, in *U.S. Citizens Association*, this Court concluded that the Affordable Care Act's individual mandate to obtain health insurance did *not* implicate a liberty interest, in part because it did not require individuals to accept any particular treatment. 705 F.3d at 601. And *Kanuszewski* involved a different right than the one in Capen's case—the right of parents to rear children, including to make medical decisions on their behalf—and the plaintiffs challenged the collection and storage of blood samples. 927 F.3d at 418. None of these cases reflect that the right to refuse treatment protects Capen's ability to refuse to attend his evaluations.[4]

---

[4]Protected liberty interests for the purposes of procedural due process may also arise from state law, as well as from the Constitution directly. *Mikel v. Quin*, 58 F.4th 252, 260 (6th Cir. 2023); *see also Paul v. Davis*, 424 U.S. 693, 710 (1976) (observing that protected liberty and property interests "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law"). In addition to pointing to the Due Process Clause, Capen appears to briefly argue that Michigan has recognized a right to refuse medical treatment, citing a Michigan Court of Appeals case that recognized "the common-law right to be free from nonconsensual physical invasions," and which held that a physician operating on or treating a patient must do so consensually. *In re Rosebush*, 491 N.W.2d 633, 635 (Mich. Ct. App. 1992). But this common law right appears at best to furnish a liberty interest similar to the federal right to refuse treatment, which was not violated in Capen's case.

The right to refuse medical treatment therefore does not vest Capen with a protected interest in this case.  Although Capen does not raise these arguments, we also observe that the record does not appear to suggest that Capen's fitness-for-duty evaluations deprived him of a property interest in his employment without due process.  Capen's collective bargaining agreement provided that he could be terminated only for "just cause," which would bestow on him a property interest in his continued employment.  *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 566 (6th Cir. 2004).  However, Capen's termination was not caused by his fitness-for-duty evaluations.

Instead, after Capen's first evaluation, the County appeared to have viewed Capen as though he might have a disability, and it pivoted to determining whether it could offer reasonable accommodations for him to perform his work, as required by the Americans with Disabilities Act, *see* 42 U.S.C. § 12112(b)(5)(A).  For this purpose, the County scheduled an "interactive process" meeting for September 8, 2021 to identify "the potential reasonable accommodations available."  *See* 8/26/2021 Letter, R. 25-20, Page ID #512; *see also* 29 C.F.R. § 1630.2(o)(3) (explaining that the purpose of an interactive process pursuant to the Act is to "identify the precise limitations resulting from [any] disability and potential reasonable accommodations that could overcome those limitations").  And unlike Capen's first fitness-for-duty evaluation, which was held at a psychological-services provider, the interactive-process meeting was to be held in the Controller's Office, and the record does not suggest that Capen would be psychologically evaluated during that meeting.  This did not appear to be, in other words, another evaluation merely cast under a new label.

The letter setting the interactive-process meeting plainly stated that "Capen's refusal to participate in the interactive process w[ould] constitute abandonment of his position."  8/26/2021 Letter, R. 25-20, Page ID #513.  It is undisputed that Capen failed to attend this meeting, did not offer any excuses for his absence, and did not attempt to reschedule the meeting.  His decision

not to attend the interactive-process meeting was therefore the cause of his termination, not his fitness-for-duty evaluations.**[5]**

Whether the County's possible treatment of Capen as disabled or whether its handling of the interactive process complied with the Americans with Disabilities Act is not before us because Capen does not bring a claim under the Act. Also not before us is the issue of whether the proposed mandatory interactive-process meeting deprived Capen of a property interest in his employment without due process. The sole issue Capen has briefed and which he asks us to decide is whether his fitness-for-duty evaluations violated his procedural due process rights under the Constitution.

As with any property interest in his employment, Capen would also face difficulty showing that his fitness-for-duty evaluations deprived him of the Due Process Clause's protections against stigma and of the right to privacy. The record does not suggest that the results of Capen's first evaluation were publicized, contained false information, or were made "in conjunction with the plaintiff's termination," as required in this Circuit for an employee's due process claim based on stigma. *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 584 (6th Cir. 2021) (citations omitted). The same is true of the protection of the privacy of medical information. *See U.S. Citizens Ass'n*, 705 F.3d at 602. In this Circuit, "legitimate requests for medical information do not constitute an invasion of the right to privacy." *Gutierrez v. Lynch*, 826 F.2d 1534, 1539 (6th Cir. 1987); *see also Whalen v. Roe*, 429 U.S. 589, 606 (1977) (Brennan, J., concurring) (explaining that narrowly disseminated medical information requested by a public health official "with a legitimate interest in the information" would not be "generally regarded as an invasion of privacy," but that contrary circumstances could "implicate constitutionally protected privacy rights"). The County appeared to have a legitimate interest in seeking medical information in connection with Capen's fitness-for-duty evaluations. It did not arbitrarily subject Capen to a fitness-for-duty evaluation, but acted upon specific allegations that Capen had threatened violence, which had been reported to a supervisor and then reiterated in a formal written submission.

---

**[5]**Capen also then declined to take advantage of the pre-termination hearing that the County offered him two days after it sent him a termination letter.

Even when affording due consideration to Capen's rights as an employee, the County had a countervailing duty and responsibility to protect the interests, well-being, and safety of employees and others in the workplace against threats of violence or the potentiality of violence from other employees. There is nothing on the record of this case to suggest that the employer acted unreasonably in carrying out its responsibilities in that regard.

The only right that Capen claims Defendants violated—his ability to refuse his fitness-for-duty evaluations under the circumstances present here—does not furnish to him a protected interest under the Due Process Clause. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008). We do not address whether or the extent to which an employee may refuse fitness-for-duty evaluations under circumstances not presented in this case. Suffice it to say that compelling circumstances existed in the instant case which justified and supported the County's decision to require the fitness-for-duty evaluations.

While Capen's fitness-for-duty evaluations were no doubt stressful, deeply personal, and consequential to him, he has not shown that his ability to refuse these evaluations was protected by the Constitution. Capen is therefore unable to demonstrate that Defendants violated his constitutional rights, defeating his claim under 42 U.S.C. § 1983.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment to Defendants.